[Civ. No. 18565.   Second Dist., Div. Two.   Dec. 14, 1951.]

BILL SASS et al., Appellants, v. WILBUR JOHN HANK et al., Respondents.

Marvin M. Chesebro and Abe Richman for Appellants.

John A. White and Malcolm E. Stewart for Respondents.

MOORE, P. J.—On November 20, 1945, plaintiffs prepared and executed a written contract whereby they agreed to loan to defendants 46 Kodachrome negatives to be used for the purpose of manufacturing a type of greeting card called "Claytoons." Omitting immaterial passages, the contract is as follows:

"1. This contract shall be for the period of two years from the date of this letter. Both parties agree to give 60 days written notice from expiration date for cancellation. In the event of no written notice, the contract shall become renewed automatically for an additional two years. . . .

"6. The California Greeting Card Company guarantees a minimum production and sale of 15,000 cards on each subject accepted from Sass-Dorne Studio.

"7. In event of cancellation of contract or any failure to produce cards by The California Greeting Card Company, the royalties due Sass-Dorne Studio on all subjects shall become due and payable immediately.

"8. In the event of no sale or production of the cards, California Greeting Card Company agrees to pay Sass-Dorne Studio a royalty on all subjects accepted on the minimum volume agreement (15000 cards).

"9. The royalty to be paid Sass-Dorne Studio by The California Greeting Card Company shall be 10% of *the retail selling price* of the greeting cards. This royalty is due and payable 30 days from date of shipment . . .

"11. In the event of no sale or production of cards the minimum retail price of the cards shall be figured at 15 cts."

On April 19, 1946, paragraph 9 of this contract was amended to read as follows:

"9. The royalty to be paid Sass-Dorne Studio by the California Greeting Card Company shall be 10% of *the gross billing for* the greeting cards. This royalty is due and payable 30 days from date of shipment." (Italics added.)

Forty-six of such negatives were delivered to defendants on the date of the writing. Five months later the contract was amended by substituting four words, to wit, "the gross billing for" in lieu of "the retail selling price" in paragraph 9. Otherwise there was no change.

In January, 1950, plaintiffs sued on the contract in three counts, (1) for 10 per cent of the gross billing of the guaranteed minimum production of 15,000 greeting cards manufactured from each of the 46 plates and sold during the period

ending November 19, 1947, in the sum of $10,300; (2) for the same amount as 10 per cent of the gross billing of the guaranteed minimum production of 15,000 cards manufactured from each plate in the next two years, alleging that the contract was renewed automatically by reason of the failure of defendants to give written notice of its cancellation 60 days prior to November 20, 1947; (3) for possession of plates, color separations and original art work pertaining to 46 illustrated subjects of the value of $2,300. This last count was dismissed upon the return of the materials claimed by plaintiffs.

The court found that defendants did not guarantee a minimum production and sale of 15,000 cards on each Kodachrome subject accepted from plaintiffs; that defendants did not agree that in the event of no production or sale of cards the minimum retail price of each card would be 15 cents; that the amount to be paid for the sale of greeting cards manufactured by the use of the Kodachromes was 10 per cent of defendants' gross sales price; that defendants had accounted for and paid plaintiffs for all sales during the period expiring November 19, 1947, except the sum of $346.95 which was tendered in court; that no notice in writing terminating the contract was given but that in September, 1947, the parties made an "oral agreement which was then fully performed and executed by the parties whereby each party waived, relinquished and gave up the right to require written notice from the other party cancelling said contract, and said parties did at said time agree that said contract and the amendment thereto would be rescinded, cancelled and abandoned, and that it would not be in existence after November 19, 1947"; that the contract was not renewed. Upon such findings plaintiffs recovered only the sum of $346.95.

## Is the Contract Ambiguous?

The trial court determined that the contract is ambiguous and admitted testimony as to the intention of the parties from which the findings were derived that defendants did not "guarantee a minimum production and sale of 15000 cards on each subject" accepted from plaintiffs.[1] Also, from such testimony, finding was made (1) that defendants did not agree to pay plaintiffs "a royalty on all subjects accepted on the minimum volume agreement (15000 cards)"[2] and (2) that it is not true "in the event of no sale or production of cards the minimum retail price of the cards shall be figured at 15 cents."[3] Re-

[1, 2, 3]Contain quotations from paragraphs 6, 8, 11 of the contract.

spondents contend that the change made in paragraph 9 obliterates the original contract in toto, citing *De La Beckwith* v. *Sheldon*, 165 Cal. 319 [131 P. 1049] ; Restatement of Contracts, section 408; *Simmons* v. *Sweeney*, 13 Cal.App. 283 [109 P. 265] ; Code of Civil Procedure, section 1864.

██ With such contention we cannot agree. There is no contradiction between paragraph 9 as amended and the contents of the other portions of the contract. Paragraph 6 is defendants' guaranty that it will in two years' time produce and sell 15,000 cards on each subject or form leased to them. Such a guaranty is customary and reasonable in contracts licensing the use of a patented device or any object of which the licensor has a monopoly. If the licensee were allowed to use the forms of plaintiffs without holding them to a minimum of production the value of such forms would soon vanish without their owners having profited by permitting others to use them. The amendment did not cancel paragraph 7. The latter obligated defendants to pay immediately the royalties on all subjects in the event defendants should "fail to produce cards." Paragraph 8 obligates defendants to pay plaintiffs a royalty on "all subjects accepted on the minimum volume agreement (15000 cards)." Finally, paragraph 11 obligates defendants to pay "the minimum retail price" (15 cents each) in the event of no production or sale of the cards by defendants. Not one of the four quoted paragraphs (6, 7, 8 and 11) is contradicted by the terms of paragraph 9 as amended.

██ Parties have a right to require their contracts to be in writing. ██ When an agreement has been thus reduced the contractor has the right to rely strictly upon the written word. ██ Before evidence of its meaning can be received it must first be determined by the court to be so ambiguous or uncertain that its meaning cannot be divined from its own language. The intention must "be ascertained from the writing alone, if possible." (Civ. Code, § 1639.) Indeed, there was no occasion in this action for resort to parol proof of the intention. Respondent Wilbur Hanks who negotiated for defendants did not testify that the "guaranteed minimum royalty" was ever mentioned in any conversation had prior to the execution of the amendment. His testimony was that he read amended paragraph 9 on receiving it and that it accurately set forth the amendment intended.

██ We have searched in vain for evidence *aliunde* the contract that would justify the elimination of paragraphs 6,

8 and 11. They clearly do not contradict paragraph 9 as amended.

The latter should be construed as a part of and as modifying the entire contract and not as a separate instrument. It contains nothing to indicate that the parties intended to abrogate the other provisions of the writing. It changed only the basis of computing royalties on cards actually sold. Instead of paying "10% of the retail selling price of the greeting cards," defendants, by the amendment, were permitted to calculate their payments on their "gross billing for the greeting cards." Such language clearly indicates the amount of royalties earned on cards produced and sold. Provision had already been made for the minimum number that must be sold, to wit, "15000 cards on each subject" and for the payment of royalties on the minimum in the event of no sale, or of a cancellation of the contract, in which case the minimum retail price should be 15 cents per card. By such provisions defendants had agreed to pay a minimum amount of royalties if no cards at all should be sold and to pay "10% of the retail selling price" within 30 days after shipment of cards that would be sold. Clearly that provision of paragraph 9 prior to modification contemplated that some sales would be made upon which royalties should be paid promptly. Evidently defendants wished a change in the contract that might effect a greater number of sales and plaintiffs desired current returns rather than wait till the end of two years to collect the guaranteed royalties. The question arises then, how did it happen that the parties agreed upon a modification of paragraph 9? It is best told in the language of respondent Wilbur Hank in testifying about his conversation with appellants in early April, 1946, as follows: "Mr. Dorne said he wasn't at all satisfied with the returns that they were getting on these greeting cards; that he thought we should print a lot more than we have done and up to that time we had only printed a few of the Sass-Dorne Claytoon ideas. I then explained to them, both Mr. Sass and Mr. Dorne, that the royalty was so high we couldn't afford to print those pictures on anything less than a twenty-five cent retail selling card and that we had to pick them generally to be sure that they were going to sell, the proper amount of those cards that were set up under the original contract that was signed, and that was one of the main reasons why we had not put too many of the Sass-Dorne numbers in the line up until that time . . . Mr. Dorne asked me why I couldn't print fifteen cent cards and ten cent cards and five cent cards and

Mr. Sass asked me why we couldn't print special baby cards such as birth announcements and birth congratulations and so forth. I said, 'Well, the reason why is because all of these cards are in the five and ten cent bracket and in order for us to put out a line of those cards we would have to put out a fifteen or ten cent card or they would not be bought.' They then suggested that if we would go ahead and reproduce some cards in cheaper brackets that they would go along and work with me; that we revamp this contract and make it easy for me to do and profitable and so I would benefit by it . . . We sat down then and discussed the framing of this amendment. The question then came up as to how the cards would be priced. Mr. Dorne asked me why I didn't contact Sears-Roebuck, for example. He said he had a contact, he thought, back in Chicago where they would buy a lot of these cards but they would have to buy them more or less on a jobber basis setup; that is, that the jobber does not pay you what the retailer pays you. The price would fluctuate according to the amount of merchandise that they bought. I brought out the point then, supposing the jobber bought a lot that we ordinarily retail for fifteen cents. He would not pay what that retailer such as Robinson's or Bullock's would pay for that card because he would have to take a discount further down the line. That same card would sell to him for fifty per cent off, plus forty per cent and in many cases plus ten per cent from that so the price then on the wholesale price of a fifteen cent card, according to the quantity that they bought, would fluctuate anywhere from one and one-half cents to seven and a half cents per card. Well, that was discussed thoroughly and Mr. Sass said, 'Well, what we will do then is to arrange this amendment so that we will get a ten per cent royalty off of whatever you bill and we will call it gross billing.' '' The ''guaranteed minimum'' was not mentioned in that conversation. There was no occasion for a mention of it. It was not due; defendants had produced cards; the contract had not been cancelled. Since there was no reason for plaintiffs to forego the guaranteed minimum; since it was not even mentioned in the conversation reported by Mr. Hank; since no advantage could have been gained by plaintiffs by erasing the covenant of defendants to pay a guaranteed royalty, on what basis can it be held that the substitution in paragraph 9 of ''the gross billing for'' in the place of ''the retail selling price,'' cancelled any other provision of the contract? Indeed, it did not do so.

The only possible doubt or ambiguity appearing on the face of the writings is as to whether the guaranteed minimum royalty on 15,000 cards per subject should be computed by applying the percentage figure of 10 per cent to the retail price of 15 cents referred to in paragraph 11 of the agreement, or to apply such figure to the retail price *as adjusted* to respondents' usual gross billing price. The only evidence to which we have been referred in the record would indicate that the parties intended the computation to be made on the basis of the 15-cent retail price as provided in the original contract since there is no testimony of any discussion had with regard to the guaranteed minimum royalty. The only discussions relative to amending the initial contract were concerned with methods of increasing appellants' overall *earned* royalties by reducing the earned royalty payable on each card sold but thereby at the same time giving respondents an incentive to produce a much greater volume of inexpensive cards.

█ Even conceding the presence of this ambiguity, the rule allowing testimony to explain such ambiguity does not authorize a rewriting of the contract. That rule is resorted to only in those circumstances where the ambiguity may be dispelled "not by showing that the parties meant something other than what they said but by showing what they meant by what they said." (*United Iron Works* v. *Outer Harbor Dock & Wharf Co.*, 168 Cal. 81, 84 [141 P. 917].) █ As a material provision cannot be added to a contract upon parol proof received for the sole purpose of explaining an ambiguity (*El Zarape etc. Factory, Inc.*, v. *Plant Food Corp.*, 90 Cal.App.2d 336, 347 [203 P.2d 13]) so an important covenant cannot be stricken from a written contract solely upon the *ipse dixit* of a party thereto. If a warranty cannot be added to a written contract by parol testimony (*United Iron Works* v. *Outer Harbor Dock & Wharf Co., supra*, p. 85) such testimony is not admissible to defeat the most important provision of a contract, to wit, the covenant for the payment of royalties on a patented device or a copyrighted document. When the language of a writing is fairly susceptible to one of two constructions, extrinsic evidence may be received to enable the court to ascertain the true intent of the parties, but not to vary or modify the terms thereof (*Barham* v. *Barham*, 33 Cal.2d 416, 422 [202 P.2d 289]) or to show that the parties meant something other than what was said. (*Barnhart Aircraft, Inc.* v. *Preston*, 212 Cal. 19, 23 [297 P. 20].)

The several portions of the contract are not fairly interpreted by construing each of them separately. The entire writing must be read as a unit, giving effect to every part, "Each clause helping to interpret the other." (Civ. Code, § 1641.) In construing a written instrument the function of the judge is to ascertain and declare "what is in terms or in substance contained thereon, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such a construction is, if possible, to be adopted as will give effect to all." (Code Civ. Proc., § 1858.) ██ The language of a contract must control its interpretation when its diction is clear, reasonable and explicit and is in harmony with the general purpose of the agreement. (Civ. Code, §§ 1638, 1641.) It is the function of a court to follow this rule and not to make a new contract or to rewrite or alter by construction what has been agreed to by the contracting parties. (*Mitchel* v. *Brown*, 43 Cal.App.2d 217, 221 [110 P.2d 456].)

However, appellants cannot recover any royalties for the two-year period after November 19, 1947. Although the contract provided for an automatic two-year renewal unless the parties gave 60 days' written notice of cancellation, the trial court found that the parties later orally agreed to terminate their agreement after the expiration of the original period of two years. The record contains ample evidentiary support for such finding. ██ The mutual rescission or abrogation of a written contract may be effected by an oral agreement whether executed or not, in which event section 1698 of the Civil Code* has no application. (*Grant* v. *Aerodraulics Co.*, 91 Cal.App.2d 68, 75 [204 P.2d 683].) It is true, as appellants assert, that such agreement must be supported by a sufficient consideration, but such consideration is present here in the form of the mutual cancellation of executory contractual rights. When such is the case each party has suffered a legal detriment in giving up such rights and the consideration is adequate. (*Grant* v. *Aerodraulics Co.*, supra, p. 76; *Sistrom* v. *Anderson*, 51 Cal.App.2d 213, 219 [124 P.2d 372]; Rest. Contracts, § 406.)

Inasmuch as defendants paid $919.62 as earned royalties on sales made during the first two years, they are indebted to

---

*Section 1698 reads: "A contract in writing may be altered by a contract in writing, or by an executed oral agreement, and not otherwise."

plaintiffs in the sum of $10,300, guaranteed minimum royalties, less the sum of $919.62, leaving $9,430.38 for the first two-year period.

It is ordered that findings be modified by striking therefrom findings III, IV, and V and substituting in lieu thereof the following:

III. That defendants used the 46 Kodachrome negatives so leased to them by plaintiffs and from sales made during the first two years paid plaintiffs $919.62 as earned royalties.

IV. That by virtue of their agreement to pay specified, guaranteed minimum royalties defendants are indebted to plaintiffs for the total amount of guaranteed minimum royalties, less the sum of $919.62 paid as earned royalties, leaving $9,430.38 due with interest from November 19, 1947.

It is further ordered that all five conclusions be stricken and that in lieu thereof the following be substituted:

## CONCLUSIONS OF LAW

### I

On the first count plaintiffs are entitled to judgment in the sum of $9,430.38 with interest from November 19, 1947; that because the contract was not renewed for the two-year period following November 19, 1947, defendants are not indebted to plaintiffs in any sum on the second count.

Let judgment be entered accordingly.

Plaintiffs' purported appeal from the order denying their motion for a new trial is dismissed. As modified the judgment is affirmed.

McComb, J., concurred.

A petition for a rehearing was denied January 2, 1952, and respondents' petition for a hearing by the Supreme Court was denied February 7, 1952. Shenk, J., Edmonds, J., and Schauer, J., voted for a hearing.