[No. B143539. Second Dist., Div. One. Oct. 19, 2001.]

THE COMMITTEE TO SAVE THE BEVERLY HIGHLANDS HOMES
ASSOCIATION et al., Plaintiffs and Respondents, v.
THE BEVERLY HIGHLANDS HOMES ASSOCIATION et al.,
Defendants and Appellants.

**COUNSEL**

Wilion, Kirkwood & Kessler and Allan E. Wilion for Defendants and Appellants Dmitri Villard, Walter DeCaen, Lee Bronson and Margie Oswald.

Chapin Shea McNitt & Carter and Neil Gunny for Defendant and Appellant The Beverly Highlands Homes Association.

Corin L. Kahn and Linda Thornton for Plaintiffs and Respondents.

OPINION

**SPENCER, P. J.—**

INTRODUCTION

Defendants The Beverly Highlands Homes Association, Dmitri Villard,[1] Walter DeCaen, Lee Bronson and Margie Oswald appeal from a summary judgment in favor of plaintiffs The Committee to Save the Beverly Highlands Homes Association, Sidney Smilove and Arlene Cohen. We reverse the summary judgment.

STATEMENT OF FACTS

Defendant The Beverly Highlands Homes Association (Association) is a nonprofit mutual benefit corporation. It was formed in 1952. Its members are the owners of buildable lots in the Beverly Highlands, which is located in an area of Los Angeles north of Sunset Boulevard near West Hollywood. The Association itself does not own any of the lots in the Beverly Highlands.

A description of the property included within the Beverly Highlands, a statement as to the powers of the Association, and restrictions as to use of the property within the Beverly Highlands are set forth in the Beverly Highlands Declaration of Restrictions (Declaration). This document was recorded on June 27, 1952, by Title Insurance and Trust Company.

Four of the lots in the Beverly Highlands are called open area non-buildable lots. Owners of these lots are not members of the Association. The Declaration states that lots 65 and 66 are "restricted for use only as open areas for planting purposes, and no building or other structure shall at any time be erected on said lots . . . , nor shall any driveway or street be constructed or maintained over or through said lots . . . , without the written approval of the Association, but such restriction shall not be deemed or construed as a present dedication of said lots to the public or to the owners of building sites in said property for park or other purposes. The

---

[1]This name also is spelled Dimitri Villard in some court documents.

planting, care and maintenance of said lots shall be the duty of the Association, unless and until said lots shall be dedicated to the public as park areas for planting purposes . . . ." (Art. X, § 10.04.) The Declaration also states that lots 53 and 62 are "restricted for use only as open areas for natural growth and vegetation, areas for planting purposes and areas within which the Association may, by its written authorization, permit the location of television antennas to serve any or all of the building sites . . . ." Again, no structure, roadway or sidewalk may be constructed on the lots. The Association is responsible for any planting and maintenance of these lots until such time as they may be dedicated to the public for park use. (Art X, § 10.05.) While lot 53 is large enough to build upon, lots 62, 65 and 66 are not.[2]

The Association is governed by a board of directors (Board) pursuant to its bylaws. Directors are to "be elected annually by written ballot, which shall be sent for this purpose to each member." The ballots are to be sent back to the Association prior to its annual meeting, then counted and tabulated at the annual meeting. The five persons receiving the highest number of votes are elected to the Board. (Art. IV, § 1.)

The annual meeting is to be held on the first Monday in March. (Art. X, § 2.) "The presence in person or by proxy of members entitled to exercise a majority of the voting power of [the Association] at any meeting shall constitute a quorum for the transaction of business." (Art. X, § 6.)

The Association was suspended as a corporation on April 2, 1972. It was revived on April 19, 1989. Plaintiff Arlene Cohen (Cohen) signed the revivor.

The first annual meeting of the Association following revival of the Association was in March 1990. Whether or not there was a quorum for election purposes present at this meeting and annual meetings through 1996

---

[2]Lot 53 is an irregularly shaped lot that borders the backs of several other lots. Lot 62 is across the street from lot 53 and also borders the backs of several other lots. Lot 65 is a small triangle at an intersection, and lot 66 is a small island in the middle of a roadway.

Lot 53 was the subject of a previous lawsuit. (*Simon v. Clavin* (Jun. 8, 1978, 51491) [nonpub. opn.].) The lot was deeded to the state for nonpayment of taxes, then purchased at a public auction. The purchaser sought to free the property from the restrictions contained in the Declaration. The court held that the restrictions were enforceable as equitable servitudes unless their enforcement would be inequitable. It reversed the dismissal of the purchaser's action which followed the sustaining of a demurrer without leave to amend in order to allow the purchaser to attempt to prove enforcement of the restrictions would be inequitable.

is disputed. In 1996, however, the members of the Board were Cohen, plaintiff Sidney Smilove (Smilove), Ann Dan, Dan Fast and a fifth person.[3]

On July 10, 1996, the Board sent a letter to each member of the Association. The letter advised the members that the Association did not have a general liability insurance policy because there was "no property held in common," or common area. In August, the Board discussed purchasing lot 66, one of the open area nonbuildable lots, in order for the Association to fall within the purview of the Davis-Stirling Common Interest Development Act (Davis-Stirling Act; Civ. Code, § 1350 et seq.). At the September 9 Board meeting, the Board decided not to purchase lot 66.

In September 1996, the Board sent a letter to Association members in response to a flier criticizing the Association. The letter discussed, in part, what the consequences to the members would be if the Association were to be dissolved.

In February 1997, the Board sent a letter to Association members regarding amendment of the Declaration to ensure preservation of the views from the members' properties. The Board expressed the opinion that in order to be able to amend the Declaration at that time, the Association would have to own real property within the Beverly Highlands. The Board enclosed a ballot asking members whether they "support[ed] going forward with purchase by the Association of real property making the Beverly Highlands Homes Association subject to the provisions of the Davis-Stirling Act, in order to amend the [Declaration] at this time." The response to the letter was 16 yes votes and 40 no votes.

An annual meeting of the Association was held on March 31, 1997. There were 117 votes for the Board at this meeting. It is undisputed that this constituted a quorum. Elected to the Board at this time were defendant Dmitri Villard (Villard), defendant Walter DeCaen (DeCaen), Neil Lidbom (Lidbom), John Lamb and Richard Wells.

At meetings held on September 8 and November 25, 1997, the Board decided to send out a letter regarding the possible dissolution of the Association. On December 1, the Board sent a letter and a ballot asking Association members to vote on dissolution. Because the question of dissolution was hotly debated, the Board undertook to notify every member regarding the matter and to encourage all members to vote.

The votes were counted on January 15, 1998. There were 129 votes out of 205 eligible voters. Of those 129, 94 voted in favor of dissolving the

---

[3]This person's name is not legible in the record.

Association and 35 voted against dissolution. The Board then voted unanimously to approve dissolution of the Association. On February 21, the Board sent a letter to Association members notifying them of the results of the vote and that the Board had retained a law firm to advise it on dissolution.

At some point, John Lamb and Richard Wells resigned from the Board. On May 2, 1998, defendants Lee Bronson (Bronson) and Margie Oswald (Oswald) were appointed by the remainder of the Board to replace them. The Board sent a notice to Association members apprising them of this as well as possible problems with dissolution of the Association and encouraging them to attend the annual meeting scheduled for June 2.

While an attempt at an annual meeting and an election was made on June 2, 1998, a quorum was not present. It was proposed that another attempt at an election be made in the fall. No election took place in the fall or thereafter, however.

On March 31, 1999, the Board approved a resolution to take all steps necessary to dissolve the Association. A Certificate of Election to Wind Up and Dissolve the Association was executed. On April 1, the Board approved a Notice of Commencement of Proceedings to Voluntarily Wind Up and Dissolve. On April 28, this was sent to Association members along with a financial statement and accountant's compilation report dated February 28. The certificate of election was filed with the Secretary of State on May 5. On July 13, the California Department of Justice Auditing Department notified the Association that it was free to proceed without waiver of objections from the state pursuant to Corporations Code section 8716, subdivision (c). In order to dissolve the Association, funds held by the Association had to be returned to the members.

Plaintiffs' attorney, Corin L. Kahn, sent a letter to DeCaen, as secretary of the Association, on June 8, 1999. He stated that he had been retained by a significant number of Association members who were concerned about the efforts to dissolve the Association. Attorney Kahn requested copies of the minutes of the Board meetings for the period of March 1, 1997, through June 1999. The Board did not supply Attorney Kahn with copies of the minutes in response to this request.

PROCEDURAL BACKGROUND

On July 23, 1999, plaintiffs Committee to Save the Beverly Highlands Homes Association (Committee), Smilove and Cohen filed a first amended complaint against the Association, the Board, and Board members Villard,

DeCaen, Bronson, Oswald and Lidbom.[4] In five causes of action, plaintiffs sought (1) to enjoin wrongful dissolution of a nonprofit corporation, (2) removal of the Board, (3) an order permitting inspection of the minutes of the Board meetings, (4) an order that an annual meeting of the Association and an election be held, and (5) declaratory relief. Plaintiffs also sought injunctive relief during the pendency of the litigation. Defendant Association filed a declaration by Villard in opposition to an application for temporary restraining order and preliminary injunction. The record does not show what the trial court ruled with respect to the request for injunctive relief.

Defendants filed an answer to the first amended complaint on November 29, 1999. They denied the allegations of the complaint and asserted a number of affirmative defenses.

On approximately March 30, 2000, plaintiffs filed a motion for summary judgment or, in the alternative, summary adjudication of issues. Defendants filed opposition to the motion on April 10, along with a declaration by Villard. Their opposition was based, in part, on plaintiffs' failure to file a separate statement of undisputed facts with their motion. Plaintiffs filed their reply on April 20.

Defendants filed their own motion for summary adjudication on March 30, 2000. It was accompanied by a declaration by Villard and a separate statement of undisputed facts. On approximately April 13, 2000, plaintiffs filed opposition to defendants' motion, accompanied by supporting declarations and exhibits. They also requested that the court take judicial notice of *Simon v. Clavin.* (*Ante*, p. 1253, fn. 2) Defendants filed their reply about April 21, supported by a declaration by Villard and exhibits.

On April 27, 2000, the trial court ordered plaintiffs to file, by May 15, a separate statement in support of their motion for summary judgment and in opposition to defendants' motion for summary adjudication. It also granted the parties permission to file, by the same date, legislative history or case law regarding the meaning of Civil Code section 1352. It additionally granted them permission to file, by the same date, papers on the res judicata or collateral estoppel effect of *Simon v. Clavin.*

Plaintiffs filed a separate statement of disputed and undisputed facts in opposition to defendants' motion for summary adjudication on approximately May 2, 2000. They filed their own separate statement of undisputed

---

[4]A copy of the original complaint was not included in the record, so we do not know when it was filed. While Lidbom was named in the complaint, he is not a party to this appeal.

facts in support of their motion for summary judgment at about the same time. On May 15, they filed a memorandum concerning the res judicata or collateral estoppel effect of *Simon v. Clavin.*

On May 15, 2000, defendants filed a request for judicial notice of an unpublished opinion, *OSCA Development v. Elkin* (May 5, 2000, E023835), the legislative history of the Davis-Stirling Act, and certain treatises. They also filed a supplemental separate statement in response to plaintiffs' separate statement in support of plaintiffs' summary judgment motion and in support of their own motion for summary adjudication. They filed additional papers in support of their motion and in opposition to plaintiffs' motion as well.

At the May 16, 2000, hearing on the motions, the trial court granted an extension of time to May 24 to allow plaintiffs to file materials on the legislative history of the Davis-Stirling Act. After the materials were filed, the court would take the matter under submission until June 7, at which time it would issue a ruling. Plaintiffs filed their materials on approximately May 24.

On June 6, 2000, defendants filed a declaration by Walter Leimert, Jr., with exhibits, in support of their motion for summary adjudication. He was one of the developers of the Beverly Highlands. Defendants also filed documents relating to title to lots 65 and 66.

On June 7, 2000, the trial court issued a minute order denying defendants' motion for summary adjudication and granting plaintiffs' motion for summary judgment. It ordered plaintiffs to file and serve a proposed order meeting the requirements of Corporations Code section 7511, providing for an election of Board members.

The court filed a summary judgment ruling on June 9, 2000. Although the file stamp reads *May 9*, 2000, the date at the bottom of the document by the trial court's signature is *June 9*, 2000.

Plaintiffs filed their proposed order of election about June 21, 2000. Defendants filed opposition on July 3. They also filed objections to the trial court's June 7 minute order and June 9 summary judgment ruling, along with a counter proposed order of election.

On July 20, 2000, the trial court ordered defendants' objections stricken, in that they "were not invited by the court in its prior ruling and are procedurally improperly filed." The court also ordered that the court minutes

reflect that the summary judgment ruling was issued on June 9, and that conformed copies bearing that date be sent to the parties.[5] It further noted that its summary judgment ruling was not intended as a final judgment in the action. The court did not believe final judgment was appropriate until after the election was held, although it was willing to consider contrary approaches if the parties thought them appropriate. Finally, the court ordered that an election of a new Board take place concurrently with an annual meeting of the Association, and that plaintiffs' counsel file an order to that effect by July 24.

Plaintiffs' counsel filed a second proposed order of election, along with notices to the members and ballot, about July 23, 2000. On July 26, defendants filed objections to the trial court's June 7 minute order, June 9 summary judgment ruling, and the July 20 minute order changing the dates on the summary judgment ruling and striking defendants' prior objections. Defendants also filed a counter proposed order of election, under protest, a proposed judgment, and objections to plaintiffs' proposed order.

The trial court issued a minute order on July 28, 2000, stating that it had decided to issue a final judgment in the case at that time. It held a hearing on its proposed final judgment and a proposed ballot and notices of special election and annual meeting of the Association. It then filed a final judgment and supplement to the summary judgment ruling.

On August 1, 2000, defendants DeCaen, Villard, Bronson and Oswald filed a notice of appeal from the final judgment, as well as a number of interlocutory rulings and orders. On August 4, they filed a motion for an order staying the judgment pending appeal. This was opposed by plaintiffs. On August 15, the trial court requested additional points and authorities as to the operation of Corporations Code section 7510. Defendants filed supplemental papers on August 17. Also on August 17, plaintiffs filed opposition to a proposed ruling modifying the final judgment to allow the Association to appeal the judgment.

By minute order dated August 18, 2000, the trial court ordered that "all aspects of the judgment rendered in this case [except] those provisions

---

[5]Defendants suggest that the trial court may, in fact, have written the summary judgment ruling on May 9, 2000, which would mean that it must have ignored the papers they filed on June 6. It then improperly corrected the date on the ruling. This suggestion is not supported by the record, in that the trial court dated the ruling June 9. The May 9 date stamp was applied by the clerk. Moreover, "[w]e discuss those arguments that are sufficiently developed to be cognizable. To the extent defendant perfunctorily asserts other claims, without development and, indeed, without a clear indication that they are intended to be discrete contentions, they are not properly made, and are rejected on that basis." (*People v. Turner* (1994) 8 Cal.4th 137, 214, fn. 19 [32 Cal.Rptr.2d 762, 878 P.2d 521].)

which prohibit all defendants from acting or purporting to act as or for the Beverly Highlands Homes Association (which includes filing an appeal or otherwise acting or purporting to act) are temporarily stayed until September 12, 2000 when the Court will hear defendant's motion for a new trial and all stay issues now before the Court . . . ." The court issued a tentative ruling on stay issues on August 22. The court basically was of the opinion that a stay order would not preclude defendants from continuing to act in their capacity as Association and Board.

About August 25, 2000, plaintiffs, in response, filed an application for summary order for directors' election for mutual benefit corporation under Corporations Code section 7511, subdivision (c). Defendants filed opposition on August 31. About September 11, plaintiffs filed a response to the trial court's tentative ruling on stay issues.

On September 13, 2000, the trial court granted plaintiffs' application on the same terms set forth in the final judgment. It ordered that its previous order precluding "defendants from acting or purporting to act as the Board or as the Association is stayed only as would permit them to proceed with this litigation and without imprimatur of any approval by the court of their claimed status and without any bar to issues before the appellate court . . . ." It denied a motion by defendants for new trial. It granted motions by plaintiffs for a determination that they were the prevailing parties in this litigation and for attorney's fees.

Plaintiffs then filed an ex parte application for entry of an order on application for directors' election and annual meeting for mutual benefit corporation. On September 20, 2000, the trial court granted plaintiffs' application in part and denied it in part, noting that the requested order already had been made; the trial court simply had to sign a written order. A signed order was filed the same day.

On September 27, 2000, the Association filed a notice of appeal from the judgment. Defendants also petitioned this court for a writ of supersedeas. On October 20, we granted the petition, staying the election pending resolution of defendants' appeal.

CONTENTIONS

I

Defendants contend that, as a matter of law, the trial court erred in granting plaintiffs a summary judgment on the basis of the Davis-Stirling Act, which is inapplicable.

## II

Defendants further contend that retroactive application of the Davis-Stirling Act is unconstitutional.

## III

Defendants assert that even if the Association is dissolved, the Beverly Highlands property owners still can enforce the Declaration.

## IV

Defendants additionally assert that the trial court erred in ruling, relative to the second cause of action for removal, that the Board was a holdover board.

## V

Finally, defendants contend that the portion of the judgment relating to an election is erroneous and must be reversed.

## DISCUSSION

## I

Defendants contend that, as a matter of law, the trial court erred in granting plaintiffs a summary judgment on the basis of the Davis-Stirling Act, which is inapplicable. We agree.

Summary judgment properly is granted if there is no question of fact and the issues raised by the pleadings may be decided as a matter of law. (Code Civ. Proc., § 437c, subd. (c); *Mars v. Wedbush Morgan Securities, Inc.* (1991) 231 Cal.App.3d 1608, 1613 [283 Cal.Rptr. 238].) Inasmuch as summary judgment is a drastic procedure and should be used with caution (*Mann v. Cracchiolo* (1985) 38 Cal.3d 18, 35 [210 Cal.Rptr. 762, 694 P.2d 1134]), the moving party's papers are strictly construed, while the opposing party's papers are liberally construed (*Salazar v. Southern Cal. Gas Co.* (1997) 54 Cal.App.4th 1370, 1376 [63 Cal.Rptr.2d 522]).

Notwithstanding the strict construction given the moving party's evidence and the liberal construction given to that of the opposing party, the opponent has the burden of showing triable issues of material fact do exist; he or she may not rely on the pleadings. (*Cornelison v. Kornbluth* (1975) 15 Cal.3d

590, 596 [125 Cal.Rptr. 557, 542 P.2d 981]; *Crouse v. Brobeck, Phleger & Harrison* (1998) 67 Cal.App.4th 1509, 1524 [80 Cal.Rptr.2d 94].) As noted in *Hunter v. Pacific Mechanical Corp.* (1995) 37 Cal.App.4th 1282 [44 Cal.Rptr.2d 335] (disapproved on another ground in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855, fn. 23 [107 Cal.Rptr.2d 841, 24 P.3d 493]), "[a] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. [Citation.]" (*Hunter*, at p. 1286.)

In determining the propriety of a summary judgment, the trial court is limited to facts shown by the evidentiary materials submitted, as well as those admitted and uncontested in the pleadings. (*Sacks v. FSR Brokerage, Inc.* (1992) 7 Cal.App.4th 950, 962 [9 Cal.Rptr.2d 306]; *McDaniel v. Sunset Manor Co.* (1990) 220 Cal.App.3d 1, 5 [269 Cal.Rptr. 196].) The court must consider all evidence set forth in the parties' papers, and summary judgment is to be granted if all the papers submitted show there is no triable issue of material fact in the action, thereby entitling the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)

■ On appeal, this court exercises its independent judgment in determining whether there are no triable issues of material fact and the moving party thus is entitled to judgment as a matter of law. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 579 [37 Cal.Rptr.2d 653]; *Torres v. Cool Carriers A.B.* (1994) 26 Cal.App.4th 900, 904 [31 Cal.Rptr.2d 790].) We examine the evidence and independently determine its effect. (*Crouse v. Brobeck, Phleger & Harrison, supra,* 67 Cal.App.4th at p. 1524.) We must uphold the judgment if it is correct on any ground, regardless of the reasons the trial court gave. (*Biljac Associates v. First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1419 [267 Cal.Rptr. 819].)

To the extent that resolution of the case turns on an interpretation of statutory law, we also make an independent interpretation of the statutes involved. (*Campbell v. Arco Marine, Inc.* (1996) 42 Cal.App.4th 1850, 1855 [50 Cal.Rptr.2d 626]; *Suman v. BMW of North America, Inc.* (1994) 23 Cal.App.4th 1, 9 [28 Cal.Rptr.2d 133].) Our review of documents in the case is independent as well, provided no conflicting extrinsic evidence on the meaning of the documents was presented to the trial court. (*Martinez v. Scott Specialty Gases, Inc.* (2000) 83 Cal.App.4th 1236, 1244 [100 Cal.Rptr.2d 403].)

■ The Davis-Stirling Act, enacted in 1985 (Stats. 1985, ch. 874, § 14, p. 2774), regulates common interest developments. A common interest development is a community apartment project, condominium project,

planned development or stock cooperative. (Civ. Code, § 1351, subd. (c).) The Davis-Stirling Act "applies and a common interest development is created whenever a separate interest coupled with an interest in the common area or membership in the association is, or has been, conveyed, provided, all of the following are recorded: [¶] (a) A declaration. [¶] (b) A condominium plan, if any exists. [¶] (c) A final map or parcel map . . . ." (*Id.*, § 1352.) The Davis-Stirling Act also provides that "[a] common interest development shall be managed by an association which may be incorporated or unincorporated." (*Id.*, § 1363, subd. (a).)

A planned development is one "having either or both of the following features: [¶] (1) The common area is owned either by . . . the association or in common by the owners of the separate interests who possess appurtenant rights to the beneficial use and enjoyment of the common area. [¶] (2) A power exists in the association to enforce an obligation of an owner of a separate interest with respect to the beneficial use and enjoyment of the common area by means of an assessment which may become a lien upon the separate interests in accordance with Section 1367." (Civ. Code, § 1351, subd. (k).) A " 'separate interest' " is "a separately owned lot, parcel, area, or space." (*Id.*, subd. (*l*)(3).) A " '[c]ommon area' " is "the entire common interest development except the separate interests therein. The estate in the common area may be a fee, a life estate, an estate for years, or any combination of the foregoing. However, the common area for a planned development specified in paragraph (2) of subdivision (k) may consist of mutual or reciprocal easement rights appurtenant to the separate interests." (*Id.*, subd. (b).)

As previously stated, plaintiffs sought (1) to enjoin wrongful dissolution of the Association, (2) removal of the Board, (3) an order permitting inspection of the minutes of the Board meetings, (4) an order that an annual meeting of the Association and an election be held, and (5) declaratory relief. The trial court granted them a summary judgment.

The trial court ruled that the Beverly Highlands was a common interest development within the meaning of the Davis-Stirling Act. Under Corporations Code section 8724,[6] therefore, the approval of 100 percent of the members was required for dissolution of the Association and a transfer of the

---

[6]Corporations Code section 8724 provides: "Without the approval of 100 percent of the members, . . . so long as there is any lot, parcel, area, apartment or unit for which an owners association (as defined in Section 11003.1 of the Business and Professions Code and created in connection with any of the forms of development referred to in Section 11004.5 of the Business and Professions Code) is obligated to provide management, maintenance, preservation or control: [¶] (a) The owners association or any person acting on its behalf shall not: [¶]

Association's assets. Additionally, Civil Code section 1363, subdivision (a), requires that a common interest development have an association to manage it. Hence, the court concluded, the Association "was not properly dissolved by any proper vote as required by law."[7]

As to plaintiffs' second cause of action for removal of the Board, the trial court noted that in order for the court to remove the Board, Corporations Code section 7223 required that there be a complaint filed by a director or by 20 members of the Association. There was no such complaint in the instant action. The law "does not recognize a 'Committee' as an entity entitled to or able to sue," so a suit by Committee is insufficient to entitle plaintiffs to obtain removal of the Board.

The trial court rejected defendants' argument that the foregoing requirement applied to all causes of action, defendants having presented no authority in support of this argument. It rejected defendants' argument that a member of a nonprofit corporation cannot attack an attempt by the Board to dissolve that corporation, the argument again being unsupported by any authority. The trial court similarly rejected defendants' contention that plaintiffs Smilove and Cohen had no standing to bring this action. Finally, it rejected defendants' claims that plaintiffs' challenge to the election of the Board was barred by the nine-month statute of limitations contained in Corporations Code section 7616, and that plaintiffs were barred from obtaining relief by laches and unclean hands.

Even if plaintiffs were not entitled to removal of the Board, the trial court ruled, they were entitled to an annual meeting and a new election of directors. Therefore, under Corporations Code section 7510, the court could order that an annual meeting and an election be held.

(1) Transfer all or substantially all of its assets; or [¶] (2) File a certificate of dissolution; and [¶] (b) No court shall enter an order declaring the owners association duly wound up and dissolved."

Former section 11003.1 of the Business and Professions Code (repealed by Stats. 1989, ch. 1150, § 1, p. 4400) defined a " '[r]eal estate development' [as] a common interest development specified in subdivision (c) of Section 1351 of the Civil Code." Section 11004.5 of the Business and Professions Code refers to a "planned development, as defined in Section 11003 of this code, containing five or more lots." (Subd. (a).) Section 11003 refers back to Civil Code section 1351, subdivision (k).

In contrast to Corporations Code section 8724, section 8610 of the Corporations Code permits a corporation to "elect voluntarily to wind up and dissolve (1) by approval of a majority of all members (Section 5033), or (2) by approval of the board and approval of the members (Section 5034)." (Subd. (a).) Section 5034 of the Corporations Code defines approval of the members as approval of the majority of the members.

[7]Only 94 out of 205 eligible voters, or approximately 46 percent of the members, voted in favor of dissolution. The 94 voters were a majority of the 129 votes received on the question of dissolution, however.

Based on the foregoing, the trial court granted plaintiffs a declaration that the Board was not properly constituted and it acted in excess of its jurisdiction in attempting to dissolve the Association. The court enjoined the current Board members from acting on behalf of the Association and ordered them to permit plaintiffs' counsel to inspect their books and records. It further ordered that an annual meeting and an election be held.

The gravamen of defendants' contention is that the Beverly Highlands is not a common interest development within the meaning of the Davis-Stirling Act. The decision to dissolve the Association, therefore, was governed by Corporations Code section 8610, not section 8724. The vote on the dissolution issue was sufficient to meet the requirements of section 8610, so the Association properly was dissolved. ■■■ Before reaching this contention, however, defendants argue that, in any event, plaintiffs' cause of action to enjoin dissolution of the Association was barred by the nine-month statute of limitations contained in Corporations Code section 7527. This alone precluded summary judgment on this cause of action in plaintiffs' favor.

Corporations Code section 7527 appears in title 1, division 2, part 3, chapter 5, article 2 of the Corporations Code. Title 1, division 2, deals with nonprofit corporation law. Part 3 applies to nonprofit mutual benefit corporations. Chapter 5 addresses meetings and voting, with article 2 thereof entitled "Additional Provisions Relating to Election of Directors." Section 7527 provides: "An action challenging the validity of any election, appointment or removal of a director or directors must be commenced within nine months after the election, appointment or removal. If no such action is commenced, in the absence of fraud, any election, appointment or removal of a director is conclusively presumed valid nine months thereafter."

Section 7616 of the Corporations Code refers to "Judicial determination of validity of election or appointment." It appears in title 1, division 2, part 3, chapter 6 of the Corporations Code. Chapter 6 addresses voting of memberships. Section 7616 provides, in pertinent part, that "[u]pon the filing of an action therefor by any director or member or by any person who had the right to vote in the election at issue, the superior court of the proper county shall determine the validity of any election or appointment of any director of any corporation." (Subd. (a).) The section does not contain a limitations period.

Defendants state: "Beyond question, the term election in Section 7616 refers to any election, and not merely an election of directors." In defendants' view, since the titles of Corporations Code sections 7616 and 7527

"appear to be virtually identical and use the term 'election,'" and both sections are part of the same statutory scheme, the nine-month limitations period contained in section 7527 "should also apply to any election and ballot wherein a decision was made to dissolve." Having a nine-month limitations period only for an election of directors "would be incongruous."

■ In the construction of statutes, the primary goal of the court is to ascertain and give effect to the intent of the Legislature. (Code Civ. Proc., § 1859; *People v. Gardeley* (1996) 14 Cal.4th 605, 621 [59 Cal.Rptr.2d 356, 927 P.2d 713].) The court looks first to the language of the statute; if clear and unambiguous, the court will give effect to its plain meaning. (*Kimmel v. Goland* (1990) 51 Cal.3d 202, 208-209 [271 Cal.Rptr. 191, 793 P.2d 524]; accord, *California Fed. Savings & Loan Assn. v. City of Los Angeles* (1995) 11 Cal.4th 342, 349 [45 Cal.Rptr.2d 279, 902 P.2d 297].)

Where the court must construe the statute, it " 'turns first to the words themselves for the answer.' [Citation.]" (*Moyer v. Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) The words used should be given their usual, ordinary meanings and, if possible, each word and phrase should be given significance. (*Ibid.*; accord, *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) The words used "must be construed in context, and statutes must be harmonized, both internally and with each other, to the extent possible." (*California Mfrs. Assn. v. Public Utilities Com.* (1979) 24 Cal.3d 836, 844 [157 Cal.Rptr. 676, 598 P.2d 836]; accord, *Lungren, supra,* at p. 735.)

■ Corporations Code section 7527 refers to "any election, appointment or removal of a director or directors." It appears in an article on provisions relating to the election of directors. The language of the section, as well as the context in which it appears, suggests that the only elections to which it applies are elections "of a director or directors." (*California Mfrs. Assn. v. Public Utilities Com., supra,* 24 Cal.3d at p. 844; *Moyer v. Workmen's Comp. Appeals Bd., supra,* 10 Cal.3d at p. 230.)

Corporations Code section 7616 refers to "election or appointment of any director of any corporation." (Subd. (a).) Defendant reads this to mean that it applies to any election *or* to the appointment of a director. In our view, as with section 7527, the description "of any director" applies to both "election" and "appointment." Subdivision (c) of section 7616 requires "a copy of the complaint to be served upon the corporation *and upon the person whose purported election or appointment is questioned.*" (Italics added.) In other words, subdivision (c) presupposes that the election is of a person, i.e., a

director. Therefore, section 7616 does not mandate the interpretation of the term "election" in section 7527 as applying to any election, not merely an election for directors. (*Lungren v. Deukmejian, supra,* 45 Cal.3d at p. 735; *California Mfrs. Assn. v. Public Utilities Com., supra,* 24 Cal.3d at p. 844.)

Moreover, defendants point to nothing in the Corporations Code to suggest that the limitations period provided in section 7527 does not apply to an action brought pursuant to section 7616. Absent such a provision, there is no incongruity between the two statutes.

 Defendants next argue that plaintiffs' first cause of action for injunctive relief should have been denied on the ground of laches. The affirmative defense of laches may be applied to bar relief to a plaintiff who has delayed unduly in seeking equitable relief. (*Concerned Citizens of Palm Desert, Inc. v. Board of Supervisors* (1974) 38 Cal.App.3d 257, 265 [113 Cal.Rptr. 328].) The existence of laches is generally a factual question, and the trial court is given great discretion in determining whether to apply laches to bar relief. (*Ibid.*) The key question is whether defendants have demonstrated prejudice, making it unjust to grant relief to plaintiffs. (*San Bernardino Valley Audubon Society v. City of Moreno Valley* (1996) 44 Cal.App.4th 593, 607 [51 Cal.Rptr.2d 897].) On undisputed facts, the applicability of laches may be decided as a matter of law. (*Ibid.*)

 Here, dissolving the Association was first discussed in a September 1996 letter to Association members from the Board. On December 1, 1997, the Board sent out a letter and a ballot asking Association members to vote on dissolution. The votes were counted on January 15, 1998. A majority of those voting voted in favor of dissolution. On February 21, the Board sent a letter to Association members notifying them of the results of the vote and that the Board had retained a law firm to advise it on dissolution.

The record does not show that anything else happened with respect to the dissolution until March 31, 1999, when the Board approved a resolution to take all steps necessary to dissolve the Association. At that point, the Certificate of Election to Wind Up and Dissolve the Association was executed and filed with the Secretary of State. The Board approved a Notice of Commencement of Proceedings to Voluntarily Wind Up and Dissolve, which was sent to Association members along with a financial statement and

accountant's compilation report. Plaintiffs hired an attorney by the beginning of June, and their complaint was filed prior to July 23, 1999.[8]

Defendants state that the individual defendants, as well as the 94 members who voted for dissolution, have been prejudiced by plaintiffs' delay in filing this action after the vote for dissolution was taken. They do not explain how these people have been prejudiced. They also argue that the Association has been prejudiced "by having expended a great deal of time and expense in order to carry out the intent of the membership." They cite nothing in the record to show how much time and expense was involved in the actions taken after the dissolution vote.

In *San Bernardino Valley Audubon Society v. City of Moreno Valley, supra,* 44 Cal.App.4th 593, cited by defendants, the court found prejudice where, during the plaintiffs' one-and-one-half-year delay in filing suit, the defendants acquired millions of dollars in funds from different sources and expended funds completing an environmental impact report and environmental impact statements, and obtained a permit and approval for various development projects. In addition, numerous dependent agreements would be nullified, and millions of dollars' worth of Metropolitan Water District projects would be affected if relief were granted. (*Id.* at pp. 606-607.) Under the circumstances, the court found plaintiffs' petition for equitable relief was barred by laches as a matter of law. (*Id.* at p. 608.)

In *Concerned Citizens of Palm Desert, Inc. v. Board of Supervisors, supra,* 38 Cal.App.3d 257, during plaintiffs' nine-month delay in challenging the defendants' actions, a company incurred over $700,000 in financial liabilities in reliance on those actions. Based on this, the court concluded that substantial evidence supported the trial court's finding that the plaintiffs' action was barred by laches. (*Id.* at pp. 265-266.)

On the instant record, we cannot state that, *as a matter of law,* defendants' expenditure of time and effort was so substantial as to render it unjust to grant relief to plaintiffs. (See *San Bernardino Valley Audubon Society v. City of Moreno Valley, supra,* 44 Cal.App.4th at pp. 606-607, 608.) That it might not have been an abuse of discretion to deny relief to plaintiffs based on laches does not compel a conclusion that granting the relief sought was an abuse of discretion as a matter of law. (Cf. *People v. Superior Court (Alvarez)* (1997) 14 Cal.4th 968, 977-978 [60 Cal.Rptr.2d 93, 928 P.2d 1171].)

---

[8]As previously stated (*ante,* p. 1256, fn. 4), a copy of the complaint was not included in the record, so it is not clear when plaintiffs filed their complaint. Defendants represent that it was in June 1999. July 23, 1999, is when plaintiffs filed their first amended complaint.

Defendants further argue that admissions by plaintiff Cohen and the Board on which she served that the Beverly Highlands does not fall within the purview of the Davis-Stirling Act "show that their lawsuit is filed in bad faith and the Judgment is wrong." It is defendants who are wrong. That this plaintiff at one time believed that the Beverly Highlands did not fall within the purview of the Davis-Stirling Act does not prove that, when she filed the lawsuit years later, claiming the contrary, after consulting with an attorney, she still believed this to be the case and acted in bad faith. Even if she did act in bad faith, defendants do not explain how, as they claim, this creates a triable issue of *material* fact. (Code Civ. Proc., § 437c, subd. (c).)

Moreover, the interpretation of the Davis-Stirling Act and whether it applies to the Beverly Highlands is, in this case, a question of law for the courts. (See *Campbell v. Arco Marine, Inc.*, *supra*, 42 Cal.App.4th at p. 1855; *Martinez v. Scott Specialty Gases, Inc.*, *supra*, 83 Cal.App.4th at p. 1244.) Plaintiffs are not bound by plaintiff Cohen's opinion on this question. (Cf. *R.J. Land & Associates Construction Co. v. Kiewit-Shea* (1999) 69 Cal.App.4th 416, 425 [81 Cal.Rptr.2d 615].)

Defendants' next assertion is that plaintiffs' first cause of action for injunctive relief is barred under the doctrine of unclean hands. They argue that plaintiffs' "actions and/or admissions . . . certain[l]y could raise [*sic*] to the level of unclean hands which would be a defense to an injunction." Unless plaintiffs were guilty of unclean hands *as a matter of law*, and they were not, we cannot overturn the trial court's refusal to apply this affirmative defense to bar plaintiffs from injunctive relief. (Cf. *People v. Superior Court (Alvarez)*, *supra*, 14 Cal.4th at pp. 977-978; *San Bernardino Valley Audubon Society v. City of Moreno Valley*, *supra*, 44 Cal.App.4th at pp. 606-607, 608.)

Returning to defendants' contention that the Beverly Highlands is not a common interest development within the meaning of the Davis-Stirling Act, defendants first look to section 1374 of the Civil Code. This provides: "Nothing in this title may be construed to apply to a development wherein there does not exist a common area as defined in subdivision (b) of Section 1351, nor may this title be construed to confer standing pursuant to Section 383 of the Code of Civil Procedure to an association created for the purpose of managing a development wherein there does not exist a common area."

Civil Code section 1351, subdivision (b), defines a " '[c]ommon area' " as "the entire common interest development except the separate interests therein. The estate in the common area may be a fee, a life estate, an estate

for years, or any combination of the foregoing. However, the common area for a planned development specified in paragraph (2) of subdivision (k) may consist of mutual or reciprocal easement rights appurtenant to the separate interests." It is undisputed that the only portions of the Beverly Highlands which might meet the definition of "common area" are the four nonbuildable lots, lots 53, 62, 65 and 66.

The Association has no estate in lots 53, 62, 65 and 66. Plaintiffs, in essence, admit that the separate interests in the Beverly Highlands do not include mutual or reciprocal easement rights to use of these lots. They argue that the restrictions on the use of these lots "share the fundamental characteristics of an easement. Not all restrictions create property interests amounting to easement rights, but those that limit ownership rights for the common benefit and enjoyment do." They cite no authority in support of this argument.

■ "An easement is an interest in the land of another, which entitles the owner of the easement to a limited use or enjoyment of the other's land." (4 Witkin, Summary of Cal. Law (9th ed. 1987) Real Property, § 434, p. 614, italics omitted.) An easement appurtenant to the land is "attached to the land of the owner of the easement, and benefits him as the owner or possessor of that land." (*Id.*, § 435, p. 615.)

"An easement differs from a covenant running with the land and from an equitable servitude, in that these are created by promises concerning the land, which may be enforceable by or binding upon successors to the estate of either party, while an easement is an interest in the land, created by grant or prescription." (4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 434, p. 615, italics omitted.) A covenant running with the land is created by language in a deed or other document showing an agreement to do or refrain from doing something with respect to use of the land. (*Id.*, § 484, pp. 661-662.) An equitable servitude may be created when a covenant does not run with the land but equity requires that it be enforced. (*Id.*, § 493, p. 670.)

■ As defendants point out, the Declaration does not create any easement rights to the use of lots 53, 62, 65 and 66. Article X of the Declaration addresses easement rights, setting forth the easement rights to which the properties in Beverly Highlands are subject. Section 10.04 restricts use of lots 65 and 66 to "open areas for planting purposes," with no structures or roads to be constructed over them. This restriction "shall not be deemed or construed as a present dedication of said lots to the public or to the owners of building sites in said property for park or other purposes." The Declaration reserved the right, however, to make such a dedication in the future.

Similarly, section 10.05 restricts use of lots 53 and 62 to "open areas for natural growth and vegetation, areas for planting purposes and areas within which the Association may, by its written authorization, permit the location of television antennas to serve any or all of the building sites," with no other structure, road or way to be constructed over them. Again, this restriction "shall not be deemed or construed as a present dedication of said lots to the public or to the owners of building sites in said property for planting or other purposes." The Declaration again reserved the "right to dedicate said lots to the public as open areas for the nurture of natural growth and vegetation or for planting purposes." The Declaration also granted the Association the power to permit the owners of homesites to plant these lots.

Generally, planned developments are governed by CC&R's (covenants, conditions and restrictions) or declarations. These are enforceable as covenants running with the land or equitable servitudes. (See, e.g., *Citizens for Covenant Compliance v. Anderson* (1995) 12 Cal.4th 345, 352-355 [47 Cal.Rptr.2d 898, 906 P.2d 1314]; *Nahrstedt v. Lakeside Village Condominium Assn.* (1994) 8 Cal.4th 361, 379 [33 Cal.Rptr.2d 63, 878 P.2d 1275].)

The language in the Declaration at issue here clearly creates covenants running with the land or equitable servitudes as to lots 53, 62, 65 and 66. It creates restrictions as to the use of that land. (4 Witkin, Summary of Cal. Law, *supra*, Real Property, § 484, pp. 661-662.)[9] It does not give the owners of the other lots in the Beverly Highlands any interest in those lots or any right to use those lots for their own enjoyment. Hence, it does not create any "mutual or reciprocal easement rights appurtenant to the separate interests" (Civ. Code, § 1351, subd. (b)). (4 Witkin, Summary of Cal. Law, *supra*, §§ 434, 435, pp. 614-616.)

By the very terms of Civil Code section 1351 and the Declaration, the Beverly Highlands has no common area. As previously stated, we will give effect to the plain meaning of a statute if the language of the statute is clear and unambiguous. (*California Fed. Savings & Loan Assn. v. City of Los Angeles, supra,* 11 Cal.4th at p. 349; *Kimmel v. Goland, supra,* 51 Cal.3d at pp. 208-209.) Similarly, if the language of an agreement is clear and explicit and does not involve an absurdity, interpretation of the contract is based on the language of the agreement alone. (Civ. Code, §§ 1638, 1639; *Sass v. Hank* (1951) 108 Cal.App.2d 207, 211 [238 P.2d 652].)

Nothing in the legislative history of the Davis-Stirling Act cited by plaintiffs leads to any different conclusion. Rather, everything they cite

---

[9]In *Simon v. Clavin, supra,* 51491, the court found the restrictions imposed on lot 53 by the Declaration may be enforceable as equitable servitudes.

points to the conclusion that in order for a planned development to fall within the act, there must be, at a minimum, appurtenant easement rights to a portion of the development. And, as previously stated, they cite no authority for the proposition that restrictions on the use of a property are the equivalent of an easement.

*Southern Cal. Edison Co. v. Bourgerie* (1973) 9 Cal.3d 169 [107 Cal.Rptr. 76, 507 P.2d 964], cited by plaintiffs, holds only "that building restrictions constitute property rights for purposes of eminent domain proceedings." (*Id.* at p. 172.) *Nahrstedt v. Lakeside Village Condominium Assn., supra,* 8 Cal.4th 361, also cited by plaintiffs, notes that "[u]nder the law of equitable servitudes, courts may enforce a promise about the use of land even though the person who made the promise has transferred the land to another. [Citation.] The underlying idea is that a landowner's promise to refrain from particular conduct pertaining to land creates in the beneficiary of that promise 'an equitable interest in the land of the promisor.' [Citations.]" (*Id.* at p. 379.) *Nahrstedt* does not hold that this enforceable " 'equitable interest in the land' " is an actual interest in the land, such as an easement, which entitles the promisee to use the promisor's land. Rather, it holds that the equitable servitudes may be enforced to restrict the promisor's use of his or her own property. (*Id.* at p. 389.)

Neither does *King v. Kugler* (1961) 197 Cal.App.2d 651 [17 Cal.Rptr. 504, 92 A.L.R.2d 872], cited by plaintiffs at oral argument, compel a different conclusion. *King* dealt with the interpretation of a declaration of conditions and restrictions applicable to property in a particular tract. (*Id.* at pp. 652, 654.) It did not hold that the conditions and restrictions in the declaration constituted easements, only that they were enforceable against purchasers of those properties. (*Id.* at p. 654.) It did not purport to define "common area" and, inasmuch as it preceded the enactment of the Davis-Stirling Act, it has no bearing on the meaning of that term as used in the act.

Accordingly, we must conclude that the Beverly Highlands has no common area within the meaning of Civil Code section 1351, subdivision (b). Therefore, the Davis-Stirling Act does not apply to it. (Civ. Code, § 1374.) The trial court erred in finding that Beverly Highlands was a common interest development within the meaning of the Davis-Stirling Act and in granting summary judgment to plaintiffs based upon that finding. (Code Civ. Proc., § 437c, subd. (c).)

## II

Defendants further contend that retroactive application of the Davis-Stirling Act is unconstitutional. In light of the conclusion reached above, we need not address this contention.

### III

Defendants assert that even if the Association is dissolved, the Beverly Highlands property owners still can enforce the Declaration. While this assertion is of no relevance to this appeal, it is correct. Article XVI of the Declaration gives the individual Beverly Highlands property owners the right to enforce the Declaration.

### IV

Defendants additionally assert that the trial court erred in ruling, relative to the second cause of action for removal, that the Board was a holdover board. The assertion has merit.

As to plaintiffs' second cause of action for removal of the Board, the trial court noted in its statement of decision that in order for the court to remove the Board, Corporations Code section 7223 required that there be a complaint filed by a director or by 20 members of the Association. There was no such complaint in the instant action. The law "does not recognize a 'Committee' as an entity entitled to or able to sue," so a suit by Committee is insufficient to entitle plaintiffs to obtain removal of the Board. Even if plaintiffs were not entitled to removal of the Board, however, they were entitled to an annual meeting and a new election of directors. Under Corporations Code section 7510, therefore, the court could order that an annual meeting and an election be held.

In the judgment, the trial court declared that the Board, by failing to hold annual meetings and elections for the Board, was in violation of the Davis-Stirling Act, the Corporations Code, the Association bylaws and the Declaration. The Board members (DeCaen, Villard, Lidbom, Bronson and Os-wald) were "not properly serving or acting as members at this time, and as to them, solely to avoid any confusion as to their status, [the] court additionally order[ed] them 'removed,' even though the terms for which they were chosen have already long since expired so no such order should be necessary to end their services[."] Therefore, the " 'existing' carry over Board [were] all . . . enjoined and restrained from taking, or purporting to take any acts as or on behalf of the Association and/or its Board."

Corporations Code section 8610 provides for voluntary dissolution of a corporation. Section 8613 provides that "[v]oluntary proceedings for winding up the corporation commence upon the adoption of the resolution required by Section 8610." (Subd. (a).) Once "a voluntary proceeding for winding up has commenced, the board shall continue to act as a board and shall have full powers to wind up and settle its affairs, both before and after the filing of the certificate of dissolution." (*Id.*, subd. (b).) Additionally, "the

corporation shall cease to conduct its activities except to the extent necessary for the beneficial winding up thereof . . . ." (*Id.*, subd. (c).)

Under Corporations Code section 8613, once voluntary dissolution of the Association was approved, the Board could continue acting to wind up and settle the Association's affairs. No corporate activities unnecessary to the winding up could take place. An annual meeting and election of new Board members were unnecessary to the winding up. As stated in 2 Marsh's California Corporation Law (4th ed. 2001) Dissolution, section 21.10, pages 21-51 through 21-52: "Normally, of course, there would be no further annual election of directors by the shareholders after the commencement of a proceeding for the winding up and dissolution of the corporation. Such a proceeding normally would not last more than one year and, even if it did, the corporation is no longer conducting its business as originally intended and the expense of holding a meeting of shareholders would hardly be justifiable." Thus, if a voluntary proceeding for winding up commenced in accordance with Corporations Code section 8610, no further annual meetings or elections were necessary. (*Id.*, § 8613.)

## V

Finally, defendants contend that the portion of the judgment relating to an election is erroneous and must be reversed. In light of the conclusion reached above, and our conclusion in part I, *ante*, that the judgment must be reversed, we need not separately address this contention.

The judgment is reversed. Defendants are to recover their costs on appeal.[10]

Mallano, J., concurred. Vogel (Miriam A.), J., concurred in the judgment only.

Respondents' petition for review by the Supreme Court was denied January 29, 2002.

---

[10]Plaintiffs request an award of sanctions on appeal for defendants' failure to file an appendix that meets the requirements of the California Rules of Court. Specifically, defendants' eight-volume appendix contained no indices, was not numbered consecutively, and did not contain conformed copies of documents. (Cal. Rules of Court, rules 5.1(c)(1), 9(d).) We would be inclined to award sanctions, as these defects hindered our review of the record as well. However, plaintiffs failed to follow the proper procedure for requesting sanctions, which is set forth in rule 26(e) of the California Rules of Court. Specifically, they failed to file a motion for sanctions including a declaration as to the amount of sanctions sought. For this reason, we must decline their request.