[No. E048176. Fourth Dist., Div. Two. June 15, 2010.]

CLARENDON AMERICA INSURANCE COMPANY, Plaintiff and Appellant, v.
NORTH AMERICAN CAPACITY INSURANCE COMPANY, Defendant and Respondent.

558

**COUNSEL**

Law Offices of Karen-Denise Lee, Karen-Denise Lee; Blau & Associates and David S. Blau for Plaintiff and Appellant.

Grimm, Vranjes, McCormick & Graham, A. Carl Yaeckel, Charles A. Phillips and Mark Vranjes for Defendant and Respondent.

**OPINION**

**KING, J.—**

## I. INTRODUCTION

Eagle Ranch Residential, LLC, doing business as Tanamera Homes and Resort Communities, LLC (Tanamera), constructed a residential development in Victorville known as Shenandoah at Eagle Ranch (Eagle Ranch). Clarendon America Insurance Company (Clarendon) and North American Capacity Insurance Company (NAC), the parties to the present action, insured Tanamera under separate and consecutive general commercial liability policies.

In the present action, Clarendon sued NAC for declaratory relief, equitable contribution, and partial equitable indemnity, seeking a proportionate or equitable share of sums Clarendon expended to defend Tanamera in a construction defect action brought by the owners of 43 Eagle Ranch homes (the Bradley action).[1] NAC moved for summary judgment on the ground its duty to defend Tanamera in the Bradley action never arose because Tanamera never paid a $25,000 "per claim" self-insured retention (SIR) for *each home* involved in the Bradley action and completed after November 30, 2002, the effective date of the NAC policy.

---

[1] In its operative complaint, Clarendon did not expressly seek an equitable proportion of the sums it later paid to settle the Bradley action; however, when a duty to defend is shown, a nonparticipating coinsurer is presumptively liable for a proportionate share of a settling insurer's costs of defense *and settlement*. (*Safeco Ins. Co. of America v. Superior Court* (2006) 140 Cal.App.4th 874, 880 [44 Cal.Rptr.3d 841].)

Only eight of the 43 homes involved in the Bradley action were completed after November 30, 2002. Thus, NAC argued it had no duty to defend Tanamera unless and until Tanamera expended $200,000 (eight times $25,000) of its own funds in settlements, judgments, or "Claims Expense[s]." Clarendon maintained that the $25,000 SIR in the NAC policy applied only one time to the Bradley action as a whole, not to each of the eight allegedly defective homes covered by the NAC policy. The trial court granted NAC's motion, and Clarendon appeals from the ensuing judgment entered in favor of NAC.

We reverse. For the reasons we explain, NAC did not meet its burden of showing there was no potential for coverage under the terms of its policy, or no duty to defend Tanamera in the Bradley action, as a matter of law. NAC relied solely on the terms of its $25,000 SIR endorsement to support its motion, but in view of other terms of the NAC policy and the apparent circumstances at the time the policy was issued, as revealed by the evidence on the motion, Tanamera may have had an objectively reasonable expectation, at the time the policy was issued, that the $25,000 SIR would apply only once to the Bradley action as a whole, rather than to each of the eight homes constructed after November 30, 2002. NAC failed to show that Tanamera had no such reasonable expectation, as a matter of law, and all of the papers submitted on the motion leave this possibility open. Accordingly, NAC's motion was erroneously granted.

## II. PROCEDURAL HISTORY AND UNDISPUTED FACTS[2]

In late 2006, Leslie D. Bradley, an Eagle Ranch homeowner, sued Tanamera in a class action on behalf of a class consisting of the owners of approximately 273 Eagle Ranch homes, alleging the homes contained construction defects. The class action allegations were later dismissed and the complaint was amended to identify specific homeowners as plaintiffs. Ultimately, the Bradley action involved 73 Eagle Ranch homeowners and 43 Eagle Ranch homes.

Tanamera tendered the defense of the Bradley action to both Clarendon and NAC. Clarendon defended Tanamera under a reservation of rights, eventually settling the case with all 73 homeowners for a single lump sum payment of $690,000. NAC refused Tanamera's tender on the ground it had no duty to defend or indemnify Tanamera unless and until Tanamera satisfied the $25,000 "per claim" SIR in the NAC policy. According to NAC, the $25,000

---

[2] The facts set forth in this section are undisputed and are based on the parties' separate statements of undisputed facts and the evidence submitted in support of the statements.

SIR applied to each of the eight homes that were completed after November 30, 2002, and involved in the Bradley action. Thus, according to NAC, Tanamera had to expend $200,000 of its own funds in defense or settlement of the Bradley action before NAC's duty to defend Tanamera arose.

The Clarendon policy was in effect from November 28, 2000, through November 28, 2002. The NAC policy was in effect from November 26, 2002, through May 30, 2005. Coverage under the NAC policy applied to " 'bodily injury,' 'property damage,' 'personal and advertising injury' and medical expenses" arising out of the "ownership, maintenance or use" of the Eagle Ranch premises and the "project," which was defined as 450 single-family dwellings.

Pursuant to the terms of an endorsement to the NAC policy entitled "Exclusion—Designated Work," coverage under the NAC policy excluded "all construction prior to 11-30-02 except homes under construction/not yet completed." As indicated, only eight of the 43 homes involved in the Bradley action were completed after November 30, 2002. Thus, only eight of the 43 homes were covered by the NAC policy. The premium for the NAC policy was $404,320. The aggregate liability limit was $2 million.

The record does not reveal the total number of Eagle Ranch homes constructed during the two and one-half year period of the NAC policy. Thus, the record does not indicate the total number of Eagle Ranch homes, if any, completed after November 30, 2002, other than or in addition to the eight homes involved in the Bradley action.

In 2007, while the Bradley action was still pending and before Clarendon settled it for a lump sum payment of $690,000, Clarendon sued NAC in the present action for declaratory relief, equitable contribution, and partial equitable indemnity. Clarendon alleged that NAC's duty to defend Tanamera arose after Tanamera satisfied a single $25,000 SIR, or expended $25,000 of its own funds in relation to the Bradley action.

NAC moved for summary judgment on Clarendon's complaint on the ground it was not liable to Clarendon "under any of its alleged theories." Specifically, NAC argued that its duty to defend or indemnify Tanamera had never arisen because Tanamera had never met the $25,000 SIR for each of the eight homes involved in the Bradley action and potentially covered by the NAC policy. Thus, NAC argued it had no duty to indemnify Clarendon for any part of the monies it expended in defense or settlement of the Bradley action.

In support of its motion, NAC relied solely on the terms of its policy, specifically its $25,000 SIR endorsement. The following appears at the top of

the first page of the two-page SIR endorsement: "THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY. [¶] SELF-INSURED RETENTION [¶] Per Claim [¶] Self-Insured Retention: $25,000 Per Claim."

In its initial paragraph, the SIR endorsement provides that the terms of the policy are subject to the terms, conditions, and provisions stated in the endorsement, and in the event of a conflict, the terms, conditions, or provisions of the endorsement control over those of the policy. Thereafter, the SIR endorsement contains 13 numbered paragraphs. Pertinent portions of those paragraphs read as follows:

"1. The Self-Insured Retention, shown above, applies to each and every claim made against any insured, to which this insurance applies, regardless of how many claims arise from a single 'occurrence' or are combined in a single 'suit.'

"2. . . . The Limits of Insurance will apply only in excess of the Self-Insured Retention, hereinafter referred to as the 'Retained Limit.' We have no duty to defend or indemnify unless and until the amount of the 'Retained Limit' is exhausted by payment of settlements, judgments, or 'Claims Expense' by you.

"3. Should any claim under this policy result in a settlement or judgment not exceeding the 'Retained Limit,' including 'Claims Expense,' then no 'Claims Expense,' damages or indemnity will be payable by us.

"4. Should any claim arising under this policy result in a settlement or judgment, including 'Claims Expense' incurred by the insured or on the insured's behalf, in excess of the 'Retained Limit,' we will pay those amounts in excess of the 'Retained Limit' to which this insurance applies subject to the Limits of Insurance as specified in the Declarations.

"5. The 'Retained Limit' will only be reduced by payments made by the insured."

In support of its motion, NAC proffered 12 undisputed facts with supporting evidence. These concerned the number of homes involved in the Bradley action, the effective dates of the NAC policy, the terms of the SIR endorsement, the exclusion of coverage under the NAC policy for homes completed before November 30, 2002, and, finally, the fact Clarendon was claiming Tanamera had satisfied the $25,000 SIR—one time—by expending $25,000 of its own funds in defense of the Bradley action. As indicated, NAC

maintained its SIR endorsement, or $25,000 "per claim" SIR, applied to each of the eight homes involved in the Bradley action that were completed after November 30, 2002.

Clarendon did not dispute that only eight of the homes involved in the Bradley action were completed after November 30, 2002, and subject to the NAC policy. It argued, however, that the $25,000 SIR applied only one time to the Bradley action as a whole. In support of its position, Clarendon proffered eight additional facts, alleging that the Bradley action was a "collective" action involving questions of law and fact common to all 43 Eagle Ranch properties; the plaintiffs in the action did not seek damages on a "per-home" basis and did not present individual settlement demands, the action was defended in its entirety, and "only one settlement" was paid to resolve the "homeowners' portion" of the action. These allegations were supported by the declaration of Brian S. Letofsky, an attorney who represented Tanamera in the Bradley action.

Clarendon also claimed that Tanamera had paid "in excess of $25,000 in the defense" of the Bradley action. This allegation was supported by the declaration of Attorney Karen-Denise Lee. Ms. Lee stated: "In the course of representing the interests of Clarendon America in the [Bradley action], I received a letter dated June 8, 2007, from Andre Y. Bates of the law firm of Marron & Associates. The letter was in response to my inquiry regarding the fees and expenses paid by [Tanamera] in the defense of the [Bradley action]. A true and correct copy of the letter and the enclosures thereto are attached . . . ." The attachments or enclosures to Mr. Bates's letter appear to be copies of checks Tanamera paid to the law firm of Marron & Associates for attorney fees.

NAC disputed Clarendon's additional facts, claiming its allegations concerning the collective nature of the Bradley action were argument, not facts. NAC also proffered evidentiary objections to Clarendon's remaining allegations. The trial court sustained one objection, ruling that Ms. Lee did not properly authenticate the copies of checks attached to the letter she received from Mr. Bates. Thus, Clarendon failed in its attempt to show that Tanamera had paid $25,000, or any other amount, in defense of the Bradley action.

In granting the motion, the trial court ruled there were no triable issues of fact, and the issue was "just a matter of interpretation of the [NAC] policy." Clarendon appeals from the ensuing judgment in favor of NAC.

## III. DISCUSSION

### A. *Contentions on Appeal*

Clarendon claims NAC's motion for summary judgment was erroneously granted because the trial court misinterpreted the NAC policy's $25,000 SIR as applying to each of the eight homes involved in the Bradley action and completed after November 30, 2002, rather than one time to the Bradley action as a whole. Because there was only one action filed and one action to defend, Clarendon asserts there was only one "claim" subject to the $25,000 "per claim" SIR; thus NAC had a duty to defend Tanamera once it met the $25,000 SIR.

NAC maintains that, although only one suit was filed, there were in fact numerous claims involved in the Bradley action—one claim for each of the eight potentially covered homes. And because the $25,000 SIR was not exhausted as to *any of* the eight claims, NAC's duty to defend Tanamera never arose, and NAC had no duty to partially indemnify Clarendon for the sums it expended in defense or settlement of the Bradley action.

### B. *Required Showings and Standard of Review on Summary Judgment (in General)*

Summary judgment is properly granted when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) "The purpose of the law of summary judgment is to provide courts with a mechanism to cut through the parties' pleadings in order to determine whether, despite their allegations, trial is in fact necessary to resolve their dispute. [Citation.]" (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*).)

A moving party *defendant* is entitled to summary judgment if it establishes a complete defense to the plaintiff's causes of action, or shows that one or more elements of each cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (*o*); *Aguilar, supra,* 25 Cal.4th at p. 849.) Generally, a moving party defendant bears the initial burden of production to make a prima facie showing that no triable issue of material fact exists. Once the initial burden of production is met, the burden shifts to the plaintiff to demonstrate a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra,* at pp. 850–851.) From commencement to conclusion, however, the moving party defendant generally bears the burden of persuasion that there is no triable issue of material fact and that the defendant is entitled to judgment as a matter of law. (*Aguilar, supra,* at p. 850.)

"In determining the propriety of a summary judgment, the trial court is limited to facts shown by the evidentiary materials submitted, as well as those admitted and uncontested in the pleadings. [Citations.] The court must consider all evidence set forth in the parties' papers, and summary judgment is to be granted if all the papers submitted show there is no triable issue of material fact in the action, thereby entitling the moving party to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).)" (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn.* (2001) 92 Cal.App.4th 1247, 1261 [112 Cal.Rptr.2d 732].)

"On appeal, this court exercises its independent judgment in determining whether there are no triable issues of material fact and the moving party thus is entitled to judgment as a matter of law. [Citations.] We examine the evidence and independently determine its effect. [Citation.] We must uphold the judgment if it is correct on any ground, regardless of the reasons the trial court gave. [Citation.]" (*Committee to Save the Beverly Highlands Homes Assn. v. Beverly Highlands Homes Assn., supra,* 92 Cal.App.4th at p. 1261.) Any doubts as to the propriety of granting the motion must be resolved in favor of the party opposing the motion. (*Seo v. All-Makes Overhead Doors* (2002) 97 Cal.App.4th 1193, 1201–1202 [119 Cal.Rptr.2d 160].)

## C.  *NAC's Burden of Proof on Its Motion for Summary Judgment*

As the moving party defendant in its motion for summary judgment, NAC had the burden of demonstrating there was no potential for coverage under the terms of its policy, or that its duty to defend Tanamera in the Bradley action never arose because the terms of the $25,000 "per claim" SIR were never met. (See *Powerine Oil Co., Inc. v. Superior Court* (2005) 37 Cal.4th 377, 390 [33 Cal.Rptr.3d 562, 118 P.3d 589] [defendant and moving party/nonparticipating insurer failed to meet its burden of showing that no potential for indemnity existed under terms of its policy on motion for summary adjudication]; see also *Standard Fire Ins. Co. v. Spectrum Community Assn.* (2006) 141 Cal.App.4th 1117, 1124 [46 Cal.Rptr.3d 804] [plaintiff and moving party insurer failed to meet its burden of showing there was no potential for coverage under terms of its policy on motion for summary judgment]; Code Civ. Proc., § 437c, subd. (p)(2).)

This rule comports with a defendant/nonparticipating insurer's burden, at trial on a plaintiff/settling insurer's action for equitable contribution, to prove the absence of coverage, or that there is no possibility of coverage under the terms of its policy, once the settling insurer has demonstrated a prima facie case of coverage. (*Safeco Ins. Co. of America v. Superior Court, supra,* 140 Cal.App.4th at p. 881; see also *Aguilar, supra,* 25 Cal.4th at p. 851 ["how the

parties moving for, and opposing, summary judgment may each carry their burden of persuasion and/or production depends on *which* would bear *what* burden of proof at trial."].)

More fundamentally, this rule comports with the principle that an "insurer's duty to defend runs to claims that are merely *potentially covered*, in light of facts alleged or otherwise disclosed. [Citations.]" (*Buss v. Superior Court* (1997) 16 Cal.4th 35, 46 [65 Cal.Rptr.2d 366, 939 P.2d 766], italics added.) The duty to defend "is a continuing one, arising on tender of defense and lasting until the underlying lawsuit is concluded [citation], or until it has been shown that there is *no* potential for coverage . . . ." (*Montrose Chemical Corp. v. Superior Court* (1993) 6 Cal.4th 287, 295 [24 Cal.Rptr.2d 467, 861 P.2d 1153].)

As indicated, NAC attempted to meet its burden of proof on its motion by relying solely on the terms of the SIR endorsement, or the $25,000 "per claim" SIR. It argued that the $25,000 "per claim" SIR applied to each home involved in the Bradley action that was completed during the period of the NAC policy, or after November 30, 2002. The trial court agreed with NAC's interpretation of its policy and granted the motion. We independently review a trial court's interpretation of the terms of an insurance contract, pursuant to well-settled rules of contract interpretation. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470 [9 Cal.Rptr.3d 701, 84 P.3d 385] (*E.M.M.I.*).)

D. *Applicable Rules of Contract Interpretation*

■ " 'The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the "mutual intention" of the parties. "Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. [Citation.] Such intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The 'clear and explicit' meaning of these provisions, interpreted in their 'ordinary and popular sense,' unless 'used by the parties in a technical sense or a special meaning is given to them by usage' [citation], controls judicial interpretation. [Citation.]" ' [Citation.]" (*E.M.M.I., supra*, 32 Cal.4th at p. 470.) "Thus, if the meaning a layperson would ascribe to contract language is not ambiguous, we apply that meaning. [Citations.]" (*AIU Ins. Co. v. Superior Court* (1990) 51 Cal.3d 807, 822 [274 Cal.Rptr. 820, 799 P.2d 1253].)

■ "A policy provision is ambiguous when it is susceptible to two or more reasonable constructions. [Citation.] Language in an insurance policy is 'interpreted as a whole, and in the circumstances of the case, and cannot be

found to be ambiguous in the abstract.' [Citation.] 'The proper question is whether the [provision or] word is ambiguous in the context of *this* policy and the circumstances of *this* case. [Citation.] "The provision will shift between clarity and ambiguity with changes in the event at hand." [Citation.]' [Citation.] Ambiguity ' " 'is resolved by interpreting the ambiguous provisions in the sense the [insurer] believed the [insured] understood them at the time of formation. [Citation.] If application of this rule does not eliminate the ambiguity, ambiguous language is construed against the party who caused the uncertainty to exist. [Citation.]' 'This rule, as applied to a promise of coverage in an insurance policy, protects not the subjective beliefs of the insurer but, rather, "the objectively reasonable expectations of the insured." ' " [Citation.] "Any ambiguous terms are resolved in the insureds' favor, consistent with the insureds' reasonable expectations." ' [Citation.]" (*E.M.M.I., supra*, 32 Cal.4th at pp. 470–471.)

■ "In determining whether an ambiguity exists, a court should consider not only the face of the contract but also any extrinsic evidence that supports a reasonable interpretation. [Citation.] . . . '[I]n order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's *objectively reasonable expectations*. [Citation.] In order to do this, the disputed policy language must be examined *in context* with regard to its function in the policy. [Citation.] This requires a consideration of the policy as [a] whole, the circumstances of the case in which the claim arises and "common sense." [Citation.]' [Citation.] Even language that may be plain and clear may be found to be ambiguous when read in the context of the policy and the circumstances of the case and, in order to give effect to the insured's objectively reasonable expectations, construed in the insured's favor. [Citations.]" (*American Alternative Ins. Corp. v. Superior Court* (2006) 135 Cal.App.4th 1239, 1246 [37 Cal.Rptr.3d 918] (*American Alternative*); see also *Nissel v. Certain Underwriters at Lloyd's of London* (1998) 62 Cal.App.4th 1103, 1111–1112 [73 Cal.Rptr.2d 174].)

E.  *For Purposes of the $25,000 "Per Claim" SIR, the Term "Claim" Is Undefined, and NAC Has Not Shown That the Term "Claim" Could Only Be Understood As Referring to Each Home Involved in a Single Suit*

As the moving party defendant, NAC failed to show that the term "claim," in its ordinary and popular sense and as used in the SIR endorsement, could only have referred to each of the 43 homes involved in the Bradley action. Notably, the NAC policy nowhere defines the term "claim," either for the specific purposes of the $25,000 "per claim" SIR or the NAC policy as a

whole. In the absence of a definition, NAC and Clarendon each assert that the policy uses the term "claim" in its "ordinary and popular sense." (*AIU Ins. Co. v. Superior Court, supra*, 51 Cal.3d at pp. 821–822.) They each advance different "ordinary and popular" meanings of the term "claim," however.

Clarendon asserts that the term "claim," for purposes of the policy as a whole and the $25,000 "per claim" SIR, means a "demand for payment" or an "assertion of liability" against a party. Clarendon argues that California courts have "consistently held that a 'claim' is the 'assertion, demand or challenge of something as a right; the assertion of a liability to the party making it to do some service or pay a sum of money.' "[3] Under this definition, Clarendon argues, "it logically follows that the number of SIRs is not determined by the number of homeowners, houses, or types of injuries sustained," but by the number of demands for payment, and here there was only one action, the Bradley action, representing one demand for payment; hence there was only one SIR.

Clarendon's logic does not necessarily follow. Even if the term "claim" ordinarily means a demand for payment, this does not settle the question whether the $25,000 "per claim" SIR applied once to the Bradley action as a whole, as Clarendon argues, or to each of the eight homes completed after November 30, 2002, as NAC contends.

NAC advances a different "ordinary and popular" meaning of the term "claim." It argues the Bradley action constitutes a single suit but is comprised of the separate and individual claims of the 73 homeowners/plaintiffs, who in the aggregate demanded payment for construction defects in 43 homes. Thus, NAC argues that the Bradley action is composed of 43 claims, or one claim for each home involved in the suit. And, because only eight of the 43 homes involved in the suit were completed after November 30, 2002, only the eight homes are potentially covered by the NAC policy. Accordingly, NAC argues, Tanamera had a duty to pay eight $25,000 SIR's or $200,000 (eight times $25,000) out of its own funds before NAC's duty to defend Tanamera in the Bradley action arose.

As NAC points out, the SIR endorsement distinguishes the term "claim" from the term "suit" in the context of the $25,000 "per claim" SIR. The SIR endorsement plainly states that the $25,000 SIR applies to "each and every claim made against any insured, to which this insurance applies, *regardless of*

---

[3] E.g., *Safeco Surplus Lines Co. v. Employer's Reinsurance Corp.* (1992) 11 Cal.App.4th 1403, 1407 [15 Cal.Rptr.2d 58], citing *Williamson & Vollmer Engineering, Inc. v. Sequoia Ins. Co.* (1976) 64 Cal.App.3d 261, 269 [134 Cal.Rptr. 427] (" 'A "claim" has been defined in ordinary English as "a demand for something due or believed to be due." (Webster's New Collegiate Dict. (7th ed. 1972) p. 152.)' ").

*how many claims arise from a single 'occurrence' or are combined in a single 'suit.' "* (Italics added.) The policy also defines the term "suit" as "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." The SIR endorsement thus contemplates that "claim" is not synonymous with "suit," and that more than one "claim" may be asserted in a "single 'suit.' "

By the same token, however, the SIR endorsement also contemplates that a single suit *may* represent a single claim. Thus, the terms of the SIR endorsement do not settle the question whether the term "claim," as used in the endorsement, refers to the Bradley action as a whole, to each of the 43 homes involved in the Bradley action, or to some other touchstone for a "demand for payment," such as the various construction defects alleged in the Bradley action.

The policy also distinguishes the term "claim" from "suit" in contexts other than the $25,000 "per claim" SIR or the SIR endorsement. First, the policy defines the term "suit" to mean "a civil proceeding in which damages because of 'bodily injury', 'property damage' or 'personal and advertising injury' to which this insurance applies are alleged." And, without defining the term "claim," the policy provides that the "Limits of Insurance," as shown in the declarations, "fix the most [the insurer] will pay regardless of the number of: [¶] a. Insureds; [¶] b. Claims made *or* 'suits' brought; or [¶] c. Persons or organizations making claims *or* bringing 'suits'." (Italics added.) In this "Limits of Insurance" context, the terms "claim" and "suit" are used in the disjunctive and are thus distinguished from each other. The policy's failure to define "claim" while defining "suit" bolsters the distinction between the two terms.

Similarly, the policy distinguishes the terms "claim" and "suit" by imposing duties upon the insured in the event "a claim is made *or* 'suit' is brought," including the duty to "[c]ooperate with [the insurer] in the *investigation or settlement of the claim or defense against the 'suit.' "* The policy further states that NAC "will have the right and duty to defend the insured against any 'suit' " seeking covered damages, and may, in its discretion, "investigate any 'occurrence' and settle *any claim or 'suit'. . . .*" (Italics added.) In these contexts, too, the term "claim" is distinguished from the term "suit."

Thus, the term "claim," both within the context of the SIR endorsement and other policy provisions, is distinguished from the term "suit." And, as indicated, in the context of the SIR endorsement, the policy contemplates that numerous "claims" may comprise a "suit." All of this language supports NAC's construction of the $25,000 "per claim" SIR as applying to a single claim rather than a single suit.

That said, however, the term "claim" is used synonymously with the term "action" or "suit" for purpose of a key endorsement titled "Defense of Claims or Suits." In reference to the insured's obligation to pay fees to independent counsel selected by the insured, in the event of a conflict of interest between the insurer and insured, the "Defense of Claims or Suits" endorsement states: "Our obligation to pay fees to counsel selected by the insured is limited to the rates which we actually pay to counsel we retain in the ordinary course of business in the defense of similar *actions* in the community where *the claim* is being defended." (Italics added.) Though the terms "claim" and "actions" are not defined in the policy, their use in this context is synonymous, and both terms are used synonymously with "suit."

The "Defense of Claims or Suits" endorsement is of particular significance in determining whether, at the time the policy was issued, a reasonable insured in Tanamera's position would have understood that the $25,000 "per claim" SIR applied to the Bradley action as a whole, as Clarendon contends, rather than to *each* of the eight homes involved in the Bradley action constructed after November 30, 2002, as NAC contends. Although the SIR endorsement distinguishes a "claim" from a "suit," and contemplates that many claims may be brought in a single suit, the SIR endorsement is reconcilable with the "Defense of Claims or Suits" endorsement and NAC's duty to defend against "claims," which in this context is used synonymously with an action or suit. In this context, construing the term "claim" synonymously with "suit" is consistent with Clarendon's position. Given the somewhat mixed use of the word "claim" in the context of the policy as a whole and the extrinsic circumstances of the case, we conclude the word "claim" as used in the policy is ambiguous, or susceptible to two reasonable constructions.[4]

NAC points out that the language of the Defense of Claims or Suits endorsement is "practically identical" to language contained in subdivision (c) of Civil Code section 2860 and that the endorsement, like the statute, deals solely with the hourly rate to be paid to independent counsel for the insured which must be appointed in the event a conflict of interest arises between

---

[4] At least one court has observed that, "in their ordinary and popular sense, the words 'suit' and 'claim' have different meanings" and are not synonymous. (*Fireman's Fund Ins. Co. v. Superior Court* (1997) 65 Cal.App.4th 1205, 1216 [78 Cal.Rptr.2d 418].) The same court cited Oxford English Dictionary, Webster's Tenth New Collegiate Dictionary, and Black's Law Dictionary definitions of the term "suit" as referring to "a formal proceeding," or an " 'action or process in a court for the recovery of a right or claim.' " (*Fireman's Fund Ins. Co. v. Superior Court, supra*, at p. 1216.) The court also cited cases holding that the term "claim," "can be any number of things, none of which rise to the formal level of a suit," and, in its ordinary meaning and as interpreted by the courts, the term "claim" means a " 'demand for something as a right . . . .' " (*Ibid.*) The court concluded that, "[w]hile a claim may ultimately ripen into a suit, 'claim' and 'suit' are not synonymous." (*Ibid.*) This, too, is unhelpful in determining the meaning of the term "claim" as applied to the Bradley action or any other construction defect suit.

NAC and the insured. And, because the Defense of Claims or Suits endorsement and the SIR endorsement deal with different issues, NAC argues that the synonymous use of the terms "claim" and "suit" in the Defense of Claims or Suits endorsement "does not signify a change in the NAC policy's consistent differentiation between 'claim' and 'suit' " for purposes of the SIR. We agree that the Defense of Claims or Suits endorsement deals with an issue, namely, the hourly rate payable to independent counsel, that is unrelated to the function and purpose of the SIR endorsement. But this begs the question whether the $25,000 SIR of the NAC policy applies only once to the Bradley action as a whole or applies to each of the eight homes completed after November 30, 2002, and subject to the NAC policy.

As previously noted, disputed policy language must be examined " '*in context* with regard to its function in the policy. [Citation.] This requires a consideration of the policy as [a] whole, the circumstances of the case in which the claim arises[,] and "common sense." ' " (*American Alternative, supra*, 135 Cal.App.4th at p. 1246.) Given that the NAC policy nowhere defines the term "claim"; that the SIR endorsement contemplates that a single suit may represent either a single claim or several claims; and given the synonymous use of the terms "claim," "action," and "suit" in the Defense of Claims or Suits endorsement, a reasonable insured in Tanamera's position may have understood that the term "claim," as used in the SIR endorsement, was synonymous with "suit."

NAC relies on *Forecast Homes, Inc. v. Steadfast Ins. Co.* (2010) 181 Cal.App.4th 1466 [105 Cal.Rptr.3d 200] to support its argument that this court is "creating" an ambiguity in the SIR endorsement based on the language of the unrelated Defense of Claims or Suits endorsement. In *Forecast Homes*, Division Three of this court construed the SIR endorsement of an insurance policy as unambiguously allowing only the policy's named insured, a subcontractor, as opposed to an additional insured, a real estate developer, to satisfy the SIR. *Forecast Homes* is distinguishable, however, because the SIR endorsement involved in the case plainly did not allow an additional insured to satisfy the SIR. The SIR endorsement stated: " 'Payments by others, including but not limited to additional insureds or insurers, do not serve to satisfy the self-insured retention.' " (*Id.* at p. 1476.) The court also rejected the additional insured's argument that the SIR endorsement was ambiguous concerning who could satisfy the SIR, because the endorsement defined "SIR" as the " 'amount or amounts' that '*you or any insured* must pay . . . .' " (*Id.* at pp. 1476–1477, italics added.) The additional insured argued that the phrase "any insured" in the definition of SIR necessarily included an additional insured. (*Ibid.*) The court rejected the argument, in part, because the endorsement further defined "you" and "your" to mean only the named insured. (*Id.* at p. 1478.)

In short, the NAC policy nowhere defines the term "claim." And, although the term "claim" may ordinarily mean "demand for payment," this does not answer the question whether, for purposes of the $25,000 "per claim" SIR, the term "claim" should be construed as referring to the Bradley action as a whole, or the various individual demands for payment asserted in that action, however those demands may be defined. Thus, the term "claim," as used in the SIR endorsement, has no ordinary and popular meaning as applied to the Bradley action.[5]

■ Based on the terms of the NAC policy as a whole, including the SIR endorsement, we discern no reason why the term "claim" must be understood as referring to each home involved in the Bradley action, rather than to some other touchstone or demand for payment involved in that action. As used in the SIR endorsement, the term "claim" is susceptible to both Clarendon's and NAC's proffered meanings. It could reasonably be understood as referring to the Bradley action as a whole, or to any number of demands for payment involved in that suit, whether for each homeowner, each home, or the various construction defects alleged in the action.

---

[5] NAC's position that a suit may be comprised of several claims begs the question whether the Bradley action represented one claim or was comprised of several claims. Moreover, NAC does not advance any reason why the term "claim," as used in the SIR endorsement, can only be understood as referring to each of the 43 homes involved in the Bradley action, or to the eight homes potentially covered by the NAC policy.

NAC asserts that courts interpreting the term "claim" in insurance contracts have "universally" interpreted the term as applying to each third party asserting a demand or claim against an insured, rather than to the single occurrence or accident giving rise to the claims, and regardless of how many claims or demands are asserted in a single suit. NAC points out that the court in *Lamberton v. Travelers Indem. Co.* (Del. 1974) 325 A.2d 104, affirmed in *Lamberton v. Travelers Indem. Co.* (Del. 1975) 346 A.2d 167, 169, interpreted the term "claim" as applying to each of several injured workmen, rather than to the aggregate demands of the workmen, and that the policy's $10,000 deductible therefore applied to the separate demands or claims of each workman. Similarly, in *Combined Communications Corp. v. Seaboard Surety Co.* (9th Cir. 1981) 641 F.2d 743, 745, *Kent Ins. Co. v. Capitol Maintenance* (Fla.Dist.Ct.App. 1983) 433 So.2d 1295, 1297, *Pennsylvania Home Improvement Co. v. American Casualty Co.* (1955) 4 Pa. D. & C.2d 516, 519–520, and *Atlas Underwriters, Ltd. v. Meredith-Burda, Inc.* (1986) 231 Va. 255, 258–259 [343 S.E.2d 65], the courts held that the term "claim" was unambiguous and applied to each third party asserting a demand for payment against the insured, even though several demands or "claims" were combined in a single suit against the insured.

None of these cases is helpful in determining whether the $25,000 "per claim" SIR applied to each of the 43 homes involved in the Bradley action, however. Each case involved different policies with different terms, and in each case the courts found the term "claim" to be unambiguous. Here, however, and for the reasons we have explained, the term "claim" is ambiguous or reasonably susceptible of two or more meanings, including those ascribed to it by NAC and Clarendon.

F. *NAC Has Not Shown That Tanamera Did Not Reasonably Expect That the $25,000 "Per Claim" SIR Would Apply to a Single Construction Defect Action Involving Numerous Homes*

Having failed to show that the term "claim," in its "ordinary and popular" sense, referred to each of the 43 homes involved in the Bradley action, NAC had the burden of showing that the term "claim" was not ambiguous, that is, that Tanamera could not have had an objectively reasonable expectation that the term would apply to a single construction defect lawsuit, or to the Bradley action as a whole. (*E.M.M.I., supra*, 32 Cal.4th at pp. 470–471 [where insurance contract term is ambiguous, it must be read in conformity with insured's objectively reasonable expectations].) In other words, NAC had the burden of showing that Tanamera *could not have had an objectively reasonable expectation* that the $25,000 "per claim" SIR would apply only one time to a single construction defect lawsuit involving numerous homeowners and homes, such as the Bradley action. NAC failed to meet this burden, and for this reason its motion was erroneously granted.

The language of an insurance policy is ambiguous if it is susceptible of more than one reasonable interpretation in the context of the policy as a whole. (*American Alternative, supra*, 135 Cal.App.4th at p. 1245.) For the reasons we have explained, the term "claim" is ambiguous in the context of the SIR endorsement and the NAC policy as a whole. As used in the policy, the term "claim" is susceptible of referring to a single suit, such as the Bradley action, as Clarendon claims, to each of the 43 homes involved in the Bradley action, as NAC claims, or to other demands for payment involved in the Bradley action, depending on how the term claim may be reasonably understood.

Nevertheless, an ambiguity may be construed against an insurer only if the insured had an *objectively reasonable expectation* there would be coverage under the policy consistent with the ambiguity. (*American Alternative, supra*, 135 Cal.App.4th at p. 1245.) In determining whether such an ambiguity exists, a court should consider not only the face of the contract but also any *extrinsic evidence* that supports a reasonable interpretation, consistent with the objectively reasonable expectations of the insured. (*Id.* at p. 1246.)

In the words of the *Nissel* court: "In order to conclude that an ambiguity exists which will be construed against an insurer, it is necessary first to determine whether the coverage under the policy, which would result from such a construction, is consistent with the insured's *objectively reasonable expectations*. [Citation.] In order to do this, the disputed policy language must be examined *in context* with regard to its intended function in the policy.

[Citation.] This requires a consideration of the policy as a whole, the circumstances of the case in which the claim arises and 'common sense.' [Citation.]" (*Nissel v. Certain Underwriters at Lloyd's of London, supra,* 62 Cal.App.4th at pp. 1111–1112.) It also requires a consideration of extrinsic evidence that supports an objectively reasonable interpretation. (*American Alternative, supra,* 135 Cal.App.4th at p. 1246.)

In support of its motion, NAC proffered no evidence concerning the objectively reasonable expectations of its insured, Tanamera, at the time the NAC policy was issued. The record contains no evidence concerning whether Tanamera may have reasonably expected that the $25,000 "per claim" SIR would apply to a single construction defect action involving numerous homeowners and homes, or would apply to each home involved in any number of construction defect actions. Rather incidentally, however, the record shows the policy premium was $404,320, the policy was in effect from November 26, 2002, through May 30, 2005, the policy had an aggregate liability limit of $2 million, and the policy potentially covered as many as 450 Eagle Ranch homes. Clarendon and NAC did not dispute that the NAC policy potentially covered only eight of the 43 homes involved in the Bradley action, because only eight of the 43 homes were completed after November 30, 2002, and the policy excluded coverage for homes completed before November 30, 2002.

Still, there is no showing of the number of homes Tanamera reasonably expected the policy would cover at the time the policy was issued. Did Tanamera reasonably expect that the policy would cover as many as 450 homes constructed after November 30, 2002? Although the policy defined "project" as 450 single-family homes, the record does not provide an answer to this question. The number of homes Tanamera reasonably expected would be covered by the policy has a substantial bearing on whether Tanamera had an objectively reasonable expectation that the $25,000 "per claim" SIR would apply to a single suit involving any number of homes, or would apply to each home potentially covered by the policy—regardless of the number of suits filed.

Indeed, assuming Tanamera reasonably expected the policy would potentially cover 450 homes, it is questionable whether a reasonable insured in Tanamera's position would have agreed to pay a $404,320 premium for a policy with a $2 million aggregate liability limit, and subject to a $25,000 "per claim" or "per home" SIR, which the insured was obliged to satisfy *before* NAC had a duty to defend the insured in any suit involving any number of allegedly defective homes. If so, that would mean the insured contemplated paying the $404,320 premium plus SIR's totaling $11.25 million (450 times $25,000) in exchange for $2 million in maximum liability

coverage on 450 homes, *before* NAC had a duty to defend the insured in a single action involving all 450 homes.

This scenario only carries NAC's position to its logical conclusion. As indicated, NAC claims its duty to defend Tanamera in the Bradley action did not arise unless and until Tanamera paid $200,000 (eight times $25,000) or eight SIR's. But based on the present record, NAC has not shown that a reasonable insured in Tanamera's position could not have reasonably expected that the $25,000 "per claim" SIR would apply only once to a single construction defect suit, regardless of the number of homes or homeowners involved in the suit, at the time the policy was issued. Thus, NAC did not meet its burden of showing there was no possibility of coverage, or that it had no duty to defend Tanamera in the Bradley action, unless and until Tanamera paid eight SIR's, or $200,000.

## IV. DISPOSITION

The judgment is reversed and the matter is remanded to the trial court with directions to conduct further proceedings consistent with this opinion. The parties shall bear their respective costs on appeal.

McKinster, Acting P. J., and Miller, J., concurred.